(Slip Opinion) OCTOBER TERM, 2020 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FEDERAL COMMUNICATIONS COMMISSION ET AL. *v.* PROMETHEUS RADIO PROJECT ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 19–1231.   Argued January 19, 2021—Decided April 1, 2021*

Under its broad authority to regulate broadcast media in the public interest, the Federal Communications Commission (FCC) has long maintained several ownership rules that limit the number of radio stations, television stations, and newspapers that a single entity may own in a given market.  Section 202(h) of the Telecommunications Act of 1996 directs the FCC to review its media ownership rules every four years and to repeal or modify any rules that no longer serve the public interest.

In 2017, the FCC concluded that three of its ownership rules were no longer necessary to promote competition, localism, or viewpoint diversity.  The Commission further concluded that the record evidence did not suggest that repealing or modifying those three rules was likely to harm minority and female ownership.  Based on that analysis, the agency decided to repeal two of those three ownership rules and modify the third.  Prometheus Radio Project and several other public interest and consumer advocacy groups (collectively, Prometheus) petitioned for review, arguing that the FCC's decision to repeal or modify the three rules was arbitrary and capricious under the Administrative Procedure Act (APA).  The Third Circuit vacated the FCC's reconsideration order, holding that the record did not support the agency's conclusion that the rule changes would have minimal effect on minority and female ownership.

*Held*: The FCC's decision to repeal or modify the three ownership rules

——————

*Together with No. 19–1241, *National Association of Broadcasters et al.* v. *Prometheus Radio Project et al.*, also on certiorari to the same court.

was not arbitrary and capricious for purposes of the APA.  In analyzing whether to repeal or modify its existing ownership rules, the FCC considered the record evidence and reasonably concluded that the three ownership rules at issue were no longer necessary to serve the agency's public interest goals of competition, localism, and viewpoint diversity, and that the rule changes were not likely to harm minority and female ownership.

In challenging the FCC's order, Prometheus argues that the Commission's assessment of the likely impact of the rule changes on minority and female ownership rested on flawed data.  But the FCC acknowledged the gaps in the data sets it relied on, and noted that, despite its repeated requests for additional data, it had received no countervailing evidence suggesting that changing the three ownership rules was likely to harm minority and female ownership.  Prometheus also asserts that the FCC ignored two studies submitted by a commenter that purported to show that past relaxations of the ownership rules had led to decreases in minority and female ownership levels.  But the record demonstrates that the FCC considered those studies and simply interpreted them differently.

In assessing the effects of the rule changes on minority and female ownership, the FCC did not have perfect empirical or statistical data.  But that is not unusual in day-to-day agency decisionmaking within the Executive Branch.  The APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies.  And nothing in the Telecommunications Act requires the FCC to conduct such studies before exercising its discretion under Section 202(h).  In light of the sparse record on minority and female ownership and the FCC's findings with respect to competition, localism, and viewpoint diversity, the Court cannot say that the agency's decision to repeal or modify the ownership rules fell outside the zone of reasonableness for purposes of the APA.  Pp. 7–13.

939 F. 3d 567, reversed.

KAVANAUGH, J., delivered the opinion for a unanimous Court. THOMAS, J., filed a concurring opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

-----

Nos. 19–1231 and 19–1241

-----

FEDERAL COMMUNICATIONS COMMISSION, ET AL., PETITIONERS
19–1231            *v.*
PROMETHEUS RADIO PROJECT, ET AL.

NATIONAL ASSOCIATION OF BROADCASTERS, ET AL., PETITIONERS
19–1241            *v.*
PROMETHEUS RADIO PROJECT, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

[April 1, 2021]

JUSTICE KAVANAUGH delivered the opinion of the Court.

Under the Communications Act of 1934, the Federal Communications Commission possesses broad authority to regulate broadcast media in the public interest. Exercising that statutory authority, the FCC has long maintained strict ownership rules. The rules limit the number of radio stations, television stations, and newspapers that a single entity may own in a given market. Under Section 202(h) of the Telecommunications Act of 1996, the FCC must review the ownership rules every four years, and must repeal or modify any ownership rules that the agency determines are no longer in the public interest.

In a 2017 order, the FCC concluded that three of its ownership rules no longer served the public interest. The FCC

therefore repealed two of those rules—the Newspaper/Broadcast Cross-Ownership Rule and the Radio/Television Cross-Ownership Rule. And the Commission modified the third—the Local Television Ownership Rule. In conducting its public interest analysis under Section 202(h), the FCC considered the effects of the rules on competition, localism, viewpoint diversity, and minority and female ownership of broadcast media outlets. The FCC concluded that the three rules were no longer necessary to promote competition, localism, and viewpoint diversity, and that changing the rules was not likely to harm minority and female ownership.

A non-profit advocacy group known as Prometheus Radio Project, along with several other public interest and consumer advocacy groups, petitioned for review, arguing that the FCC's decision was arbitrary and capricious under the Administrative Procedure Act. In particular, Prometheus contended that the record evidence did not support the FCC's predictive judgment regarding minority and female ownership. Over Judge Scirica's dissent, the U. S. Court of Appeals for the Third Circuit agreed with Prometheus and vacated the FCC's 2017 order.

On this record, we conclude that the FCC's 2017 order was reasonable and reasonably explained for purposes of the APA's deferential arbitrary-and-capricious standard. We therefore reverse the judgment of the Third Circuit.

I

The Federal Communications Commission possesses broad statutory authority to regulate broadcast media "as public convenience, interest, or necessity requires." 47 U. S. C. §303; see also §309(a). Exercising that authority, the FCC has historically maintained several strict ownership rules. The rules limit the number of radio stations, television stations, and newspapers that a single entity may own in a given market. See *FCC* v. *National Citizens*

*Comm. for Broadcasting*, 436 U. S. 775, 780–781, and nn.
1–3, 783–784 (1978). The FCC has long explained that the
ownership rules seek to promote competition, localism, and
viewpoint diversity by ensuring that a small number of en-
tities do not dominate a particular media market. See *id.*,
at 780–781, 808; *In re 2002 Biennial Regulatory Review—
Notice of Proposed Rulemaking*, 17 FCC Rcd. 18503, 18515–
18527 (2002).

This case concerns three of the FCC's current ownership
rules. The first is the Newspaper/Broadcast Cross-Owner-
ship Rule. Initially adopted in 1975, that rule prohibits a
single entity from owning a radio or television broadcast
station and a daily print newspaper in the same media mar-
ket. The second is the Radio/Television Cross-Ownership
Rule. Initially adopted in 1970, that rule limits the number
of combined radio stations and television stations that an
entity may own in a single market. And the third is the
Local Television Ownership Rule. Initially adopted in 1964,
that rule restricts the number of local television stations
that an entity may own in a single market.

The FCC adopted those rules in an early-cable and pre-
Internet age when media sources were more limited. By
the 1990s, however, the market for news and entertainment
had changed dramatically. Technological advances led to a
massive increase in alternative media options, such as ca-
ble television and the Internet. Those technological ad-
vances challenged the traditional dominance of daily print
newspapers, local radio stations, and local television sta-
tions. See, *e.g., In re 2002 Biennial Regulatory Review—
Report and Order and Notice of Proposed Rulemaking*, 18
FCC Rcd. 13620, 13647–13667 (2003) (2002 Review).

In 1996, Congress passed and President Clinton signed
the Telecommunications Act. To ensure that the FCC's
ownership rules do not remain in place simply through in-
ertia, Section 202(h) of the Act directs the FCC to review its
ownership rules every four years to determine whether

those rules remain "necessary in the public interest as the result of competition." §202(h), 110 Stat. 111–112, as amended §629, 118 Stat. 99–100, note following 47 U. S. C. §303. After conducting each quadrennial Section 202(h) review, the FCC "shall repeal or modify" any rules that it determines are "no longer in the public interest." *Ibid.* Section 202(h) establishes an iterative process that requires the FCC to keep pace with industry developments and to regularly reassess how its rules function in the marketplace. See *In re 2002 Biennial Regulatory Review—Report*, 18 FCC Rcd. 4726, 4732 (2003).

Soon after Section 202(h) was enacted, the FCC stated that the agency's traditional public interest goals of promoting competition, localism, and viewpoint diversity would inform its Section 202(h) analyses. 2002 Review, 18 FCC Rcd., at 13627; see also *In re 1998 Biennial Regulatory Review*, 15 FCC Rcd. 11058, 11061–11062 (2000). The FCC has also said that, as part of its public interest analysis under Section 202(h), it would assess the effects of the ownership rules on minority and female ownership. 2002 Review, 18 FCC Rcd.*,* at 13627, 13634, and n. 67; see also *In re 2010 Quadrennial Regulatory Review—Notice of Inquiry*, 25 FCC Rcd. 6086, 6106 (2010); cf. *In re Amendment of Section 73.3555 [formerly Sections 73.35, 73.240 and 73.636] of the Commission's Rules Relating to Multiple Ownership of AM, FM and Television Broadcast Stations*, 100 F. C. C. 2d 74, 97 (1985).

Since 2002, the Commission has repeatedly sought to change several of its ownership rules—including the three rules at issue here—as part of its Section 202(h) reviews. See 2002 Review, 18 FCC Rcd., at 13622–13623 (eliminating strict caps on newspaper/broadcast and radio/television cross-ownership and modifying the Local Television Ownership Rule); *In re 2006 Quadrennial Regulatory Review—Report and Order and Order on Reconsideration*, 23 FCC Rcd. 2010, 2021 (2008) (relaxing the Newspaper/Broadcast

Cross-Ownership Rule). But for the last 17 years, the Third Circuit has rejected the FCC's efforts as unlawful under the APA. See *Prometheus Radio Project* v. *FCC*, 373 F. 3d 372 (2004); *Prometheus Radio Project* v. *FCC*, 652 F. 3d 431 (2011); see also 824 F. 3d 33 (2016). As a result, those three ownership rules exist in substantially the same form today as they did in 2002.[1]

The current dispute arises out of the FCC's most recent attempt to change its ownership rules. In its quadrennial Section 202(h) order issued in 2016, the FCC concluded that the Newspaper/Broadcast Cross-Ownership, Radio/Television Cross-Ownership, and Local Television Ownership Rules remained necessary to serve the agency's public interest goals of promoting "competition and a diversity of viewpoints in local markets." *In re 2014 Quadrennial Regulatory Review—Second Report and Order*, 31 FCC Rcd. 9864, 9865 (2016) (2016 Order). The FCC therefore chose to retain the existing rules with only "minor modifications." *Ibid.*

A number of groups sought reconsideration of the 2016 Order. In 2017, the Commission (with a new Chair) granted reconsideration. *In re 2014 Quadrennial Regulatory Review—Order on Reconsideration and Notice of Proposed Rulemaking*, 32 FCC Rcd. 9802 (2017) (2017 Reconsideration Order). On reconsideration, the FCC performed a new public interest analysis. The agency explained that

––––––––

[1] The FCC currently has two other ownership rules that are subject to its quadrennial Section 202(h) review: (1) the Local Radio Ownership Rule, which limits the number of radio stations that an entity may own in a single market, and (2) the Dual Network Rule, which prohibits mergers among the top four television broadcast networks (ABC, CBS, Fox, and NBC). The FCC has one additional ownership rule, the National Television Ownership Rule, which is not subject to review under Section 202(h). That rule limits the number of television stations that a single entity may own nationwide. Those other rules are not at issue in this case.

rapidly evolving technology and the rise of new media out-
lets—particularly cable and Internet—had transformed
how Americans obtain news and entertainment, rendering
some of the ownership rules obsolete. See, *e.g., id.,* at 9811–
9815. As a result of those market changes, the FCC con-
cluded that the three ownership rules no longer served the
agency's public interest goals of fostering competition, lo-
calism, and viewpoint diversity. *Id.,* at 9810, 9830, and n.
197, 9835–9836. The FCC explained that permitting effi-
cient combinations among radio stations, television sta-
tions, and newspapers would benefit consumers. See *id.*, at
9819, 9830, 9835–9836.

The Commission also considered the likely impact of any
changes to its ownership rules on minority and female own-
ership. The FCC concluded that repealing or modifying the
three ownership rules was not likely to harm minority and
female ownership. *Id.,* at 9822–9824, 9830–9831, 9839–
9840.[2]

Based on its analysis of the relevant factors, the FCC de-
cided to repeal the Newspaper/Broadcast and Radio/Televi-
sion Cross-Ownership Rules, and to modify the Local Tele-
vision Ownership Rule. *Id.,* at 9803.

Prometheus and several other public interest and con-
sumer advocacy groups petitioned for review, arguing that
the FCC's decision to repeal or modify those three rules was
arbitrary and capricious under the APA.

The Third Circuit vacated the 2017 Reconsideration Or-
der. The court did not dispute the FCC's conclusion that

---

[2] 2017 Reconsideration Order, 32 FCC Rcd., at 9822 ("We find that re-
pealing the" Newspaper/Broadcast Cross-Ownership Rule "will not have
a material impact on minority and female ownership"); *id.,* at 9830 ("[W]e
find that the record fails to demonstrate that eliminating the Radio/Tel-
evision Cross-Ownership Rule is likely to harm minority and female own-
ership"); *id.,* at 9839 ("We find that the modifications we adopt to the
Local Television Ownership Rule are not likely to harm minority and fe-
male ownership").

those three ownership rules no longer promoted the agency's public interest goals of competition, localism, and viewpoint diversity. But the court held that the record did not support the FCC's conclusion that the rule changes would "have minimal effect" on minority and female ownership. 939 F. 3d 567, 584 (2019). The court directed the Commission, on remand, to "ascertain on record evidence" the effect that any rule changes were likely to have on minority and female ownership, "whether through new empirical research or an in-depth theoretical analysis." *Id.,* at 587.

Judge Scirica dissented in relevant part. In his view, the FCC reasonably analyzed the record evidence and made a reasonable predictive judgment that the rule changes were not likely to harm minority and female ownership. *Id.,* at 590.

The FCC and a number of industry groups petitioned for certiorari. We granted certiorari. 591 U. S. \_\_\_ (2020).

## II

In the 2017 Reconsideration Order, the FCC changed three of its ownership rules because it concluded that the rules were no longer in the public interest. In particular, the FCC concluded that the rules no longer served the agency's goals of fostering competition, localism, and viewpoint diversity, and further concluded that repealing or modifying the rules was not likely to harm minority and female ownership.

Prometheus argues that the FCC's predictive judgment regarding minority and female ownership was arbitrary and capricious under the APA. See 5 U. S. C. §706(2)(A). We disagree.

The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained. Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of

the agency. A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision. See *FCC* v. *Fox Television Stations, Inc.*, 556 U. S. 502, 513–514 (2009); *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43 (1983); see also *FCC* v. *WNCN Listeners Guild*, 450 U. S. 582, 596 (1981).

In its 2017 Reconsideration Order, the FCC analyzed the significant record evidence of dramatic changes in the media market over the past several decades. See, *e.g.,* 32 FCC Rcd., at 9803, 9807, 9825, 9834. After thoroughly examining that record evidence, the Commission determined that the Newspaper/Broadcast Cross-Ownership, Radio/Television Cross-Ownership, and Local Television Ownership Rules were no longer necessary to serve the agency's public interest goals of promoting competition, localism, and viewpoint diversity. The FCC therefore concluded that repealing the two cross-ownership rules and modifying the Local Television Ownership Rule would fulfill "the mandates of Section 202(h)" and "deliver on the Commission's promise to adopt broadcast ownership rules that reflect the present, not the past." *Id.,* at 9803.

In analyzing whether to repeal or modify those rules, the FCC also addressed the possible impact on minority and female ownership. The Commission explained that it had sought public comment on the issue of minority and female ownership during multiple Section 202(h) reviews, but "no arguments were made" that would lead the FCC to conclude that the existing rules were "necessary to protect or promote minority and female ownership." *Id.,* at 9822; see also *id.,* at 9831, 9839; cf. *In re 2006 Quadrennial Regulatory Review—Further Notice of Proposed Rulemaking*, 21 FCC Rcd. 8834, 8837 (2006) (soliciting evidence on minority and female ownership); *In re 2010 Quadrennial Regulatory Review—Notice of Inquiry*, 25 FCC Rcd., at 6106, 6108–6109

(same); *In re 2014 Quadrennial Regulatory Review—Further Notice of Proposed Rulemaking and Report and Order*, 29 FCC Rcd. 4371, 4460, and n. 595, 4470 (2014) (same). Indeed, the FCC stated that it had received several comments suggesting the opposite—namely, comments suggesting that eliminating the Newspaper/Broadcast Cross-Ownership Rule "potentially could *increase* minority ownership of newspapers and broadcast stations." 2017 Reconsideration Order, 32 FCC Rcd., at 9823 (emphasis added). Based on the record, the Commission concluded that repealing or modifying the three rules was not likely to harm minority and female ownership. See *id.*, at 9822, 9830, 9839.

In challenging the 2017 Reconsideration Order in this Court, Prometheus does not seriously dispute the FCC's conclusion that the existing rules no longer serve the agency's public interest goals of competition, localism, and viewpoint diversity. Rather, Prometheus targets the FCC's assessment that altering the ownership rules was not likely to harm minority and female ownership.

Prometheus asserts that the FCC relied on flawed data in assessing the likely impact of changing the rules on minority and female ownership. Prometheus further argues that the FCC ignored superior data available in the record.

Prometheus initially points to two data sets on which the FCC relied in the 2016 Order and the 2017 Reconsideration Order. Those data sets measured the number of minority-owned media outlets before and after the Local Television Ownership Rule and the Local Radio Ownership Rule were relaxed in the 1990s. Together, the data sets showed a slight decrease in the number of minority-owned media outlets immediately after the rules were relaxed, followed by an eventual increase in later years. The 2016 Order cited those data sets and explained that the number of minority-owned media outlets had increased over time. But the FCC added that there was no record evidence suggesting that past changes to the ownership rules had caused minority

ownership levels to increase. See 31 FCC Rcd., at 9894–9895; *id.,* at 9911–9912.

In the 2017 Reconsideration Order, the FCC referred to the 2016 Order's analysis of those data sets. The FCC stated that data in the record suggested that the previous relaxations of the Local Television Ownership and Local Radio Ownership Rules "have not resulted in reduced levels of minority and female ownership." 2017 Reconsideration Order, 32 FCC Rcd., at 9831; see also *id.,* at 9823; *id.,* at 9839. The FCC further explained that "no party" had "presented contrary evidence or a compelling argument demonstrating why" altering the rules would have a different impact today. *Id.,* at 9839; see also *id.*, at 9823, and n. 138; *id.,* at 9831, and n. 201. The FCC therefore concluded that "the record provides no information to suggest" that eliminating or modifying the existing rules would harm minority and female ownership. *Id.,* at 9831; see also *id.,* at 9823; *id.,* at 9839.

Prometheus insists that the FCC's numerical comparison was overly simplistic and that the data sets were materially incomplete. But the FCC acknowledged the gaps in the data. And despite repeatedly asking for data on the issue, the Commission received no other data on minority ownership and no data at all on female ownership levels. See 2016 Order, 31 FCC Rcd., at 9894–9895, nn. 211–212; *id.*, at 9911, n. 325; 2017 Reconsideration Order, 32 FCC Rcd., at 9822–9823, and n. 138 (incorporating 2016 Order's discussion of data sets); *id.,* at 9831, and n. 201 (same); *id.*, at 9839, and n. 243 (same). The FCC therefore relied on the data it had (and the absence of any countervailing evidence) to predict that changing the rules was not likely to harm minority and female ownership.

Prometheus also asserts that countervailing—and superior—evidence was in fact in the record, and that the FCC ignored that evidence. Prometheus identifies two studies submitted to the FCC by Free Press, a media reform group.

Those studies purported to show that past relaxations of the ownership rules and increases in media market concentration had led to decreases in minority and female ownership levels. According to Prometheus, the Free Press studies undercut the FCC's prediction that its rule changes were unlikely to harm minority and female ownership.

The FCC did not ignore the Free Press studies. The FCC simply interpreted them differently. In particular, in the 2016 Order, the Commission explained that its data sets and the Free Press studies showed the same long-term increase in minority ownership after the Local Television Ownership and Local Radio Ownership Rules were relaxed. 31 FCC Rcd., at 9895, and n. 215; *id.,* at 9912, and n. 329. Moreover, as counsel for Prometheus forthrightly acknowledged at oral argument, the Free Press studies were purely backward-looking, and offered no statistical analysis of the likely future effects of the FCC's proposed rule changes on minority and female ownership. See Tr. of Oral Arg. 75–76.

In short, the FCC's analysis was reasonable and reasonably explained for purposes of the APA's deferential arbitrary-and-capricious standard. The FCC considered the record evidence on competition, localism, viewpoint diversity, and minority and female ownership, and reasonably concluded that the three ownership rules no longer serve the public interest. The FCC reasoned that the historical justifications for those ownership rules no longer apply in today's media market, and that permitting efficient combinations among radio stations, television stations, and newspapers would benefit consumers. The Commission further explained that its best estimate, based on the sparse record evidence, was that repealing or modifying the three rules at issue here was not likely to harm minority and female ownership. The APA requires no more.[3]

———————
[3] Because we hold that the Third Circuit's judgment must be reversed under ordinary principles of arbitrary-and-capricious review, we need

To be sure, in assessing the effects on minority and female ownership, the FCC did not have perfect empirical or statistical data. Far from it. But that is not unusual in day-to-day agency decisionmaking within the Executive Branch. The APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies. Cf. *Fox Television*, 556 U. S., at 518–520; *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.*, 435 U. S. 519, 524 (1978). And nothing in the Telecommunications Act (or any other statute) requires the FCC to conduct its own empirical or statistical studies before exercising its discretion under Section 202(h). Here, the FCC repeatedly asked commenters to submit empirical or statistical studies on the relationship between the ownership rules and minority and female ownership. See, *e.g., In re 2014 Quadrennial Review*, 29 FCC Rcd., at 4460, and n. 595. Despite those requests, no commenter produced such evidence indicating that changing the rules was likely to harm minority and female ownership. In the absence of additional data from commenters, the FCC made a reasonable predictive judgment based on the evidence it had. See *State Farm*, 463 U. S., at 52.

In light of the sparse record on minority and female ownership and the FCC's findings with respect to competition, localism, and viewpoint diversity, we cannot say that the agency's decision to repeal or modify the ownership rules fell outside the zone of reasonableness for purposes of the APA.[4]

---

not reach the industry petitioners' alternative argument that the text of Section 202(h) does not authorize (or at least does not require) the FCC to consider minority and female ownership when the Commission conducts its quadrennial reviews. We also need not consider the industry petitioners' related argument that the FCC, in its Section 202(h) review of an ownership rule, may not consider minority and female ownership unless promoting minority and female ownership was part of the FCC's original basis for that ownership rule.

[4] The Third Circuit also vacated the FCC's separate 2018 Incubator

\*    \*    \*

We reverse the judgment of the U. S. Court of Appeals for the Third Circuit.

*It is so ordered.*

———————

Order and the 2016 Order's definition of "eligible entity." But the Third Circuit did not offer any independent reasons for doing so. Instead, it vacated those agency actions based solely on its conclusion that the FCC failed to adequately consider minority and female ownership in the 2017 Reconsideration Order. Because we reverse the judgment of the Third Circuit as to the 2017 Reconsideration Order, it follows that the Third Circuit's judgment as to the Incubator Order and "eligible entity" definition is also reversed.

# SUPREME COURT OF THE UNITED STATES

---

Nos. 19–1231 and 19–1241

---

FEDERAL COMMUNICATIONS COMMISSION, ET AL.,
PETITIONERS
19–1231          *v.*
PROMETHEUS RADIO PROJECT, ET AL.


NATIONAL ASSOCIATION OF BROADCASTERS,
ET AL., PETITIONERS
19–1241          *v.*
PROMETHEUS RADIO PROJECT, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[April 1, 2021]

JUSTICE THOMAS, concurring.

As the Court correctly holds, the Federal Communications Commission's orders were not arbitrary and capricious. Based on the record evidence available, the FCC reasonably concluded that modifying its broadcast ownership rules would not harm minority and female ownership of broadcast media. I write separately to note another, independent reason why reversal is warranted: The Third Circuit improperly imposed nonstatutory procedural requirements on the FCC by forcing it to consider ownership diversity in the first place.

The FCC had no obligation to consider minority and female ownership. Nothing in §202(h) of the Telecommunications Act of 1996 directs the FCC to consider rates of minority and female ownership. See note following 47 U. S. C. §303 (requiring the FCC simply to consider "'the public interest as the result of competition'"). Nor could any court

force the FCC to consider ownership diversity: Courts have no authority to impose "judge-made procedur[es]" on agencies. *Perez* v. *Mortgage Bankers Assn.*, 575 U. S. 92, 102 (2015).

Disregarding these limits, the Third Circuit imposed on the FCC a nonstatutory requirement to consider minority and female ownership. The court first did so in 2004 when it vacated the FCC's modification of its Local Television Ownership Rule, faulting the FCC for "failing to mention anything about the effect this change would have on potential minority station owners." 373 F. 3d 372, 420 (2004). It then directed the FCC on remand to "consider . . . proposals for enhancing ownership opportunities for women and minorities." *Id.*, at 435, n. 82; accord, 652 F. 3d 431, 471 (2011) (reiterating that its "prior remand requir[ed] the Commission to consider the effect of its rules on minority and female ownership"). Repeating this error in 2016, the Third Circuit mandated that the FCC, "in addition to §202(h)'s requirement . . . , include a determination about 'the effect of the rules on minority and female ownership.'" 824 F. 3d 33, 54, n. 13 (quoting 652 F. 3d, at 471; brackets omitted).

Respondents try to defend the Third Circuit's ruling by noting that the FCC has previously discussed ownership diversity when considering its ownership rules. They contend that the FCC thus believed that a purpose of those rules is to promote minority and female ownership. And because an agency cannot "depart from a prior policy *sub silentio*," *FCC* v. *Fox Television Stations, Inc.*, 556 U. S. 502, 515 (2009), they argue that the FCC either had to consider ownership diversity or expressly repudiate its prior policy. That argument fails because the FCC's ownership rules—unlike some of its *non*ownership rules—were never designed to foster ownership diversity.

From its infancy, the FCC has generally focused on consumers, not producers. The year after it was established, the agency that would later become the FCC made clear

that "'emphasis must be first and foremost on the interest, the convenience, and the necessity of the listening public, and not on the interest, convenience, or necessity of the individual broadcaster.'" *FCC* v. *Pottsville Broadcasting Co.*, 309 U. S. 134, 139, n. 2 (1940) (quoting a 1928 agency document).

The FCC kept true to that design when promulgating ownership rules. For example, when it created the Newspaper/Broadcast Cross-Ownership Rule at issue here, the agency explained that its "ownership rules rest on two foundations: the twin goals of diversity of viewpoints and economic competition," and that viewpoint diversity is the "higher" policy. 50 F. C. C. 2d 1046, 1074 (1975); see also 22 F. C. C. 2d 306, 313, ¶25 (1970) (stating that the "principal purpose" of the Radio/Television Cross-Ownership Rule is "promot[ing] diversity of viewpoints" and a secondary purpose is "promot[ing] competition"). To these two consumer-focused goals, the FCC has also added a third: localism. 18 FCC Rcd. 13620, 13624, ¶8, 13645, ¶81 (2003). None of these objectives advances demographic diversity of owners for the sake of owners.

To be sure, the FCC has sometimes considered minority and female ownership of broadcast media when discussing ownership rules. Time after time, however, it has viewed those forms of diversity not "as policy goals in and of themselves, but as proxies for viewpoint diversity." 17 FCC Rcd. 18503, 18519, ¶41, and n. 116, 18521, ¶50 (2002); accord, *e.g.,* 18 FCC Rcd., at 13774, ¶389 ("diversity of ownership promotes diversity of viewpoints"); *id.,* at 13636, ¶51, 13760, ¶355 (similar); 10 FCC Rcd. 2788, ¶¶1–2 (1995) ("promoting minority ownership of broadcasting and cable television facilities serves to enhance the diversity of viewpoints presented"). The FCC has also said that ownership diversity "promote[s] competition." *Id.*, at 2789, ¶6; accord, 22 F. C. C. 2d, at 313, ¶25. And although the FCC has oc-

casionally used language that, read in isolation, could suggest a freestanding goal of promoting ownership diversity, *e.g.,* 17 FCC Rcd., at 18521, ¶50 ("[T]he Commission has historically used the ownership rules to foster ownership by diverse groups, such as minorities, women and small businesses"), these comments must be viewed in the light of the FCC's repeated statements that "the core Commission goal [is] maximizing the diversity of points of view available to the public" and that "promoting minority [and female] ownership of broadcasting and cable television facilities serves" this core goal. *E.g.,* 10 FCC Rcd., at 2788, ¶¶1–2.

Even while trying to abide by the Third Circuit's improper mandate, the FCC clarified in this proceeding that it considered ownership diversity a potential means to pursue viewpoint diversity, not a freestanding goal of its ownership rules. To cite just a few examples, in its 2016 order the FCC explained that it "has a long history of promulgating rules and regulations intended to promote diversity of ownership among broadcast licensees, and *thereby* foster a diversity of voices." App. 335 (emphasis added). It afforded certain companies waivers from various rules to "serve our broader goal of diversity of ownership, and *thus* viewpoint diversity." *Id.,* at 337 (emphasis added). And it noted that it could not promulgate a race-conscious regulation without first "demonstrat[ing] a connection between minority ownership and viewpoint diversity" that would "satisfy strict scrutiny." *Id.,* at 397; cf. *Metro Broadcasting, Inc.* v. *FCC*, 497 U. S. 547, 566–568 (1990) (upholding race-conscious "minority ownership policies" because they were "substantially related to the achievement of . . . broadcast diversity"—*i.e.,* viewpoint diversity), overruled by *Adarand Constructors, Inc.* v. *Peña,* 515 U. S. 200, 227 (1995) (requiring strict scrutiny for "all racial classifications").

The Third Circuit erred by disregarding this history. For example, when the FCC modified its Local Television Ownership Rule in 2003, the court faulted the FCC for "failing

to mention anything about the effect this change would have on potential minority station owners." 373 F. 3d, at 420. But as with its other ownership rules, the stated "objectives" for that rule were fostering viewpoint diversity and competition. 14 FCC Rcd. 12903, 12910–12912, ¶¶15, 17 (1999).[1]

Here, as in 2003, once the FCC determined that none of its policy objectives for ownership rules—viewpoint diversity, competition, and localism—justified retaining its rules, the FCC was free to modify or repeal them without considering ownership diversity. Indeed, the FCC has long been clear that "it would be inappropriate to retain multiple ownership regulations for the sole purpose of promoting minority ownership." 100 F. C. C. 2d 74, 94, ¶45 (1985). The Third Circuit had no authority to require the FCC to consider minority and female ownership. So in future reviews, the FCC is under no obligation to do so.[2]

---

[1] The FCC reiterated these objectives when modifying the rule in 2003. 18 FCC Rcd. 13620, 13708, ¶¶225–226.

[2] The FCC has recently questioned the validity of the assumption that ownership diversity promotes viewpoint diversity. 32 FCC Rcd. 9802, 9810, ¶15, n. 49 (2017). Its previous acceptance of that assumption in no way precludes the FCC from rejecting it in the future.