# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 30, 2024

Lyle W. Cayce
Clerk

No. 23-40605

———————————

Texas Medical Association; Tyler Regional Hospital, L.L.C.; Dr. Adam Corley,

*Plaintiffs—Appellees/Cross-Appellants*,

*versus*

United States Department of Health and Human Services; Office of Personnel Management; United States Department of Labor; United States Department of Treasury; Xavier Becerra, *Secretary, U.S. Department of Health and Human Services, in his official capacity*; Kiran Ahuja, *in her official capacity as the Director of the Office of Personnel Management*; Janet Yellen, *Secretary, U.S. Department of Treasury, in her official capacity*; Julie A. Su, *Acting Secretary, U.S. Department of Labor, in her official capacity*,

*Defendants—Appellants/Cross-Appellees*,

———————————————————————

LifeNet, Incorporated; Air Methods Corporation; Rocky Mountain Holdings, L.L.C.; East Texas Air One, L.L.C.,

*Plaintiffs—Appellees/Cross-Appellants*,

*versus*

United States Department of Health and Human Services; Office of Personnel Management; United

STATES DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF TREASURY; XAVIER BECERRA, *Secretary, U.S. Department of Health and Human Services, in his official capacity*; KIRAN AHUJA, *in her official capacity as the Director of the Office of Personnel Management*; JANET YELLEN, *Secretary, U.S. Department of Treasury, in her official capacity*; JULIE A. SU, *Acting Secretary, U.S. Department of Labor, in her official capacity*,

*Defendants—Appellants.*

_____

Appeal from the United States District Court
for the Eastern District of Texas
USDC Nos. 6:22-CV-450, 6:22-CV-453

_____

Before SOUTHWICK, HAYNES, and DOUGLAS, *Circuit Judges.*

HAYNES, *Circuit Judge*:

A group of healthcare providers and air-ambulance providers challenge certain agency rules regarding the No Surprises Act (the "Act"), which Congress enacted to protect patients from surprise medical bills.[1] The majority of provisions at issue concern how to calculate the "qualifying payment amount" or "QPA," which helps to determine patients' and insurers' obligations to out-of-network providers under the Act. The others involve deadlines and disclosure requirements.

The district court held several provisions unlawful and vacated them. The defendant agencies appealed as to only certain provisions. They also contend that the district court erred by vacating, rather than remanding, the

_____

[1] In a related appeal before this court, the same Plaintiffs challenged the same district court's vacatur of other rules promulgated by the Departments related to the Act. *See generally Tex. Med. Ass'n v. HHS*, 110 F.4th 762 (5th Cir. 2024). That case affirmed, but it addressed different issues.

provisions that it held unlawful.  Plaintiffs challenged the district court's holding that the disclosure provisions are not arbitrary and capricious.

For the reasons that follow, we REVERSE the district court's vacatur of the QPA-calculation provisions, AFFIRM the district court's vacatur of the deadline provision, and AFFIRM the district court's holding that the disclosure requirements are not arbitrary and capricious.

## I.     Background

We begin by providing relevant information about the Act; then we turn to the procedural history of this case.

### A. Statutory Background

Congress passed the Act to protect patients from surprise medical bills in situations where they have no choice over whether their provider is in-network.  *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182, 2758–890 (2020).[2]  Before the Act, when an out-of-network healthcare provider furnished medical care to a patient, the patient's insurer could refuse to pay or unilaterally determine what amount to pay. This sometimes left patients responsible for so-called "balance bills," the amounts of which could be staggering.  For example, Air Methods Corp., a Plaintiff in this case, charged an average price of $49,800 per air-ambulance transport in 2016, an increase of 283 percent from a decade earlier.  But even less extreme examples can be devastating.  The House Committee on

_____

[2] The relevant statutory provisions are codified in three places: (1) the Public Health Services Act, enforced by the Department of Health and Human Services ("HHS"); (2) the Internal Revenue Code, enforced by the Department of the Treasury; and (3) the Employee Retirement Income Security Act ("ERISA"), enforced by the Department of Labor.  To be consistent with the Parties' briefs and a related decision by a panel of this court, we cite to the Public Health Services Act provisions.  The parallel statutory codifications are found at I.R.C. § 9816(c) and 29 U.S.C. § 1185e (ERISA).

No. 23-40605

Education and Labor found that nearly 40 percent of adults "are unable to cover a $400 emergency expense, yet the average surprise balance bill by emergency physicians in 2014 and 2015 was an estimated $620 *greater* than the Medicare rate for the same service." H.R. REP. NO. 116-615, pt. 1, at 52 (2020) (emphasis added) (footnote omitted). Therefore, in circumstances where a patient has no choice over his or her provider,[3] the Act aims to cap the patient's share of liability to out-of-network providers at an amount comparable to what the patient would have owed had the patient received care from an in-network provider.

The Act also permits the provider to seek further compensation from the patient's health plan. Congress determined that a relevant consideration in calculating both the patient's and the health plan's liability would be the QPA. 42 U.S.C. § 300gg-111(a)(3)(E)(i). The Act defines the QPA as

> the median of the contracted rates recognized by the plan or issuer, respectively (determined with respect to all such plans of such sponsor or all such coverage offered by such issuer that are offered within the same insurance market . . . as the plan or coverage) as the total maximum payment (including the cost-sharing amount imposed for such item or service and the amount to be paid by the plan or issuer, respectively) under such plans or coverage, respectively, on January 31, 2019, for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished.

---

[3] The Act applies in the following circumstances: (1) when an insured patient receives emergency care from an out-of-network provider, *see* 42 U.S.C. § 300gg-131; (2) when an insured patient receives certain nonemergency services at an in-network facility but is nevertheless treated by an out-of-network provider, such as an anesthesiologist or radiologist, *see id.* § 300gg-132; and (3) when an insured patient is transported by an out-of-network air-ambulance provider, *see id.* § 300gg-135.

*Id.* § 300gg-111(a)(3)(E)(i)(I). The definition also incorporates adjustments for inflation each year. *Id.* § 300gg-111(a)(3)(E)(i)(II).

Although the QPA is a factor in determining the respective payment obligations of both patients and health plans, it is used differently in these two determinations. For patients, the QPA plays a primary role in determining the cost-sharing responsibility. A patient's responsibility is calculated as if the total cost of the service was no greater than the QPA, and as if the services had been provided by an in-network provider. *Id.* § 300gg-111(a)(1)(C)(ii)–(iii), (3)(H)(ii), (b)(1)(A)–(B).[4] For example, if the QPA for a given service is $1,000 and the patient's plan requires a coinsurance payment of 20 percent for that service, the patient's responsibility would be capped at $200 (if the deductible had been met).

For health plans, the QPA factors into their payment obligations as follows. When a provider submits a bill for an out-of-network service to the health plan, the plan must respond within thirty days by issuing either an initial payment or a notice of denial of payment; if the provider is dissatisfied with the plan's response, the provider may initiate a thirty-day period of open negotiation. *Id.* § 300gg-111(a)(1)(C)(iv), (b)(1)(C), (c)(1)(A). If the dispute remains unresolved, the plan and provider may proceed to an independent dispute resolution process ("IDR"), where an arbitrator determines how much the plan is required to pay the provider. *Id.* § 300gg-111(c)(1)(B), (4)(A). The Act uses "baseball-style" arbitration, meaning the provider and the health plan each offer a payment amount, along with their justification, and the arbitrator is required to select one of the two offers. *Id.* § 300gg-111(c)(5)(A)(i). The QPA is one factor that the arbitrator is to consider when

---

[4] Separate provisions of the Act create a parallel process applicable to air-ambulance providers. *See* 42 U.S.C. § 300gg-112.

choosing an offer. *Id.* § 300gg-111(c)(5)(B)(i)(II), (B)(ii), (C)(i)–(ii). The arbitrator's decision is binding on the parties and not subject to judicial review, except under circumstances described in the Federal Arbitration Act. *Id.* §§ 300gg-111(c)(5)(E)(i), 300gg-112(b)(5)(D). Once a final amount has been identified, the health plan must pay the provider that amount, offset by the patient's cost-sharing obligation and any amounts already paid by the plan. *Id.* § 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D).

The Act directs the Departments[5] to establish through rulemaking the methodology for health plans to determine the QPA and the information health plans must share with providers regarding QPA determinations. *Id.* § 300gg-111(a)(2)(B). In July 2021, the Departments promulgated an interim final rule (the "Rule"). Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36,872 (July 13, 2021).[6] As relevant here, the Rule set the methodology for determining the QPA, *id.* at 36,888–98, and the information insurers must disclose to providers about their QPA calculations, *id.* at 36,898–99. The Rule also added that the thirty-day statutory deadline for health plans to provide an initial payment or notice of denial "begins on the date the plan or issuer receives the information necessary to decide a claim for payment for such services." *Id.* at 36,900.

The Departments invoked § 553(b) of the Administrative Procedure Act ("APA"), *see* 5 U.S.C. §§ 551–59, which permits an agency to bypass the APA's notice and comment procedures for good cause. 86 Fed. Reg. at

---

[5] The "Departments" include HHS, the Office of Personnel Management, the Department of Labor, and the Department of the Treasury. We use "Departments" interchangeably with Defendants in this opinion. The other Defendants are the respective secretaries of each Department in their official capacities.

[6] The Rule has been codified in part at 45 C.F.R. § 149.140 (HHS regulations), 26 C.F.R. § 54.9816-1T (tax regulations), and 29 C.F.R. § 2590.716-1 (ERISA regulations).

36,917.  They explained that "it would be impracticable and contrary to the public interest to delay putting the provisions in these interim final rules in place until after a full public notice and comment process has been completed." *Id.*

## B.  Procedural Background

Plaintiffs[7] sued the Departments under the APA, alleging that provisions of the Rule violated the Act's unambiguous terms and were arbitrary and capricious.  The district court consolidated the lawsuits.

Both sides moved for summary judgment.  The district court held certain provisions of the Rule lawful and others unlawful.  The district court vacated the provisions of the Rule that it held unlawful and entered final judgment.  Shortly after the district court's decision, the Departments exercised their enforcement discretion to permit insurers to temporarily continue using their existing QPAs.  *FAQs about Consolidated Appropriations Act, 2021 Implementation Part 62* at 6–7 (Oct. 6, 2023).  The Departments timely appealed the district court's judgment as to certain QPA calculation provisions and the thirty-day deadline provision.  Plaintiffs timely cross-appealed the district court's judgment upholding the disclosure provision.

## II.     Jurisdiction & Standard of Review

The district court had jurisdiction over this APA suit under 28 U.S.C. § 1331.  We have jurisdiction over the district court's final judgment under 28 U.S.C. § 1291.

---

[7] Plaintiffs include Texas Medical Association, Tyler Regional Hospital, L.L.C., Dr. Adam Corley, LifeNet, Incorporated, Air Methods Corp., Rocky Mountain Holdings, L.L.C., and East Texas Air One, L.L.C.

We review a district court's grant or denial of summary judgment de novo, *Data Mktg. P'ship, LP v. Dep't of Lab.*, 45 F.4th 846, 853 (5th Cir. 2022), and its vacatur of a challenged rule for abuse of discretion, *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022).

## III.    Discussion

We first address the various challenges to the Rule before turning to the question of the proper remedy.

Pursuant to the APA, the Departments' Rule must be "set aside" if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2262 (2024), the Supreme Court overturned *Chevron*[8] and held that the APA "incorporates the traditional understanding of the judicial function, under which courts must exercise independent judgment in determining the meaning of statutory provisions." The Court recognized, however, that the "statute's meaning may well be that the agency is authorized to exercise a degree of discretion." *Id.* at 2263. "[S]ome statutes expressly delegate to an agency the authority to give meaning to a particular statutory term," while "[o]thers empower an agency to prescribe rules to fill up the details of a statutory scheme, or to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility." *Id.* (internal quotation marks and citations omitted). "When the best reading of a statute is that it delegates discretionary authority to an agency," the reviewing court fulfills its role "by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has

---

[8] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

engaged in reasoned decisionmaking within those boundaries." *Id.* (alterations adopted) (internal quotation marks and citations omitted).

On the question of reasoned decision-making, "[t]he petitioner has the burden of proving that the agency's determination was arbitrary and capricious." *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.* Although the reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given," courts are to "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983) (quotations omitted).

## A. The QPA Calculation Provisions

We first address Plaintiffs' challenges to the provisions concerning how to calculate the QPA. Pursuant to *Loper Bright*, we must first determine the boundaries of the Departments' delegated authority in this area. 144 S. Ct. at 2263. The Act directs the Departments to "establish through rulemaking . . . the methodology the group health plan or health insurance issuer offering group or individual health insurance coverage shall use to determine the qualifying payment amount." 42 U.S.C. § 300gg-111(a)(2)(B)(i). That is a fairly broad delegation of authority. But because the Act contains a definition of QPA, the Departments' methodology must be consistent with that definition. In the subsections below, we consider whether the Rule's QPA calculation provisions operate within those bounds.

No. 23-40605

### *1. Including rates regardless of the number of claims paid at that rate*

The Rule instructs that "the rate negotiated under a contract constitutes a . . . contracted rate regardless of the number of claims paid at that contracted rate." 86 Fed. Reg. at 36,889.

The district court held that this provision conflicts with the Act because the Act requires insurers to include in the QPA calculation rates for services that are "provided by a provider." *See* 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). According to the district court, the Rule permits insurers to include rates for services that certain providers have never performed and never would perform. At the heart of this issue is Plaintiffs' concern that because they are not incentivized to negotiate rates for services they will not perform, unnegotiated rates will result in an inaccurate QPA.

Based on the plain meaning of "provide," the Act contains no requirement that a service must previously have been performed by a provider for that rate to be included in the QPA calculation. As we have previously explained, "[t]o 'provide' ordinarily means 'to make available,' 'furnish,' or 'to supply something needed or desired.'" *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 476 (5th Cir. 2020) (en banc) (quoting *Provide*, AMERICAN HERITAGE DICTIONARY, https://ahdictionary.com/word/search.html?q=available (last visited Nov. 26, 2019)). Accordingly, the Act requires only that a given service be "available," *id.* (quotation omitted), regardless of whether, or how many times, it has actually been performed.

Additionally, the Act reasonably addresses concerns about the QPA's inclusion of rates for services that a given provider would never perform. It states that the QPA is "the median of the contracted rates recognized by the plan or issuer . . . for the same or a similar item or service that is provided *in the same or similar specialty and provided in the geographic region in which the item*

10

*is furnished*." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added).[9] This ensures that the QPA for a given service excludes rates from providers outside of the same specialty and geographic area.[10]

Plaintiffs argue that even providers in the same or similar specialty might not provide the same services. But Plaintiffs do not suggest how to otherwise draw and police the line separating the within-specialty services each provider might perform sometime in the future from those that they would never perform. Limiting the field of comparison rates to those agreed upon by providers in the same specialty and geographic area is a reasonable way of ensuring that services that a provider is unlikely to provide are not included in the QPA calculation.

For these reasons, we conclude that this provision is neither inconsistent with the Act nor arbitrary and capricious. We therefore REVERSE the district court's vacatur of this provision.

### 2. *Excluding case-specific agreements*

The next provision of the Rule that Plaintiffs challenge is the exclusion from the QPA calculation of ad hoc, case-specific agreements.

The Rule recognizes "that plans and issuers sometimes enter into special agreements with providers and facilities that generally are not

---

[9] Plaintiffs argue that this is an impermissible post-hoc justification raised for the first time in litigation. But we can "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43. Here, we can reasonably discernable the Departments' path from the text of the Act itself.

[10] Also, after being "informed that some plans and issuers enter $0 into their fee schedule for covered items and services that a provider or facility is not equipped to furnish," the Departments clarified that "plans and issuers should not include $0 amounts" when calculating QPAs. *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55* at 17 n.29 (Aug. 19, 2022).

otherwise contracted to participate in any of the networks of the plan or issuer." 86 Fed. Reg. at 36,889. It clarifies that "solely for purposes of the definition of contracted rate, a single case agreement, letter of agreement, or other similar arrangement . . . does not constitute a contract, and the rate paid under such agreement should not be counted among the plan's or issuer's contracted rates." *Id.* Rather, "[t]he term 'contracted rate' refers only to the rate negotiated with providers and facilities that are contracted to participate in any of the networks of the plan or issuer under generally applicable terms of the plan or coverage and excludes rates negotiated with other providers and facilities." *Id.* The Departments stated that such an approach "most closely aligns with the statutory intent of ensuring that the QPA reflects market rates under typical contract negotiations." *Id.*

The district court concluded that this provision conflicts with the Act's definition of QPA. It reasoned that case-specific agreements are "'contracted rates recognized by' an insurer 'under such plans or coverage' . . . because they are contracts to pay a specific rate for an air ambulance transport for the insurers' beneficiaries, participants, or enrollees" (quoting 24 U.S.C. § 300gg-111(a)(3)(E)(i)(I)).

We disagree and hold that this provision of the Rule does not conflict with the Act. Even assuming arguendo that case-specific agreements constitute "contracted rates," as Plaintiffs contend, that does not end the matter. To be included in the QPA calculation, the Act requires that "contracted rates" must be "recognized by the plan or issuer . . . *under such plans or coverage* . . . on January 31, 2019." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added).[11] The most natural reading of that

---

[11] Plaintiffs assert that case-specific agreements are necessarily made "under" an insurer's plan because if the plan did not authorize such agreements, the insurers would be violating ERISA. Under ERISA, plan administrators are allowed to make payments only

language is that it excludes rates *not* previously agreed to under a plan. So, at the very least, we cannot say that the Departments' choice to exclude such agreements *conflicts* with the Act.

Plaintiffs next argue that the Rule's exclusion of single-case agreements is arbitrary and capricious because of an alleged inconsistency regarding what constitutes a contractual relationship. They argue that the Act defines "participating emergency facilit[ies]" and "participating health care facilit[ies]" to mean facilities that have "a contractual relationship with" the insurer. 42 U.S.C. § 300gg-111(a)(3)(F)(ii), (b)(2)(A)(i). Under the Rule, "a single case agreement between a health care facility and a plan or issuer . . . constitutes a contractual relationship." 86 Fed. Reg. at 36,882. According to Plaintiffs, if a single-case agreement constitutes a contractual relationship in *that* context, case-specific agreements must constitute contracted rates in the QPA context.

We do not agree. The definition of "contractual relationship" is used to determine whether the Act's surprise billing protections apply to a given facility in the first place. When a facility has a "contractual relationship" with an insurer, whether through a single case agreement or otherwise, the Act's surprise billing protections apply. That inquiry is wholly separate from whether a "contracted rate[]" was "recognized by the plan or issuer . . . under such plans or coverage . . . on January 31, 2019," and therefore must be included in the QPA calculation. 42 U.S.C. § 300gg-

---

"in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). But whether a plan *permits* case-specific agreements is a separate question from whether a "contracted rate[]" was "recognized by the plan or issuer . . . under such plans or coverage . . . on January 31, 2019," such that it should be included in the QPA calculation. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).

111(a)(3)(E)(i).　　Accordingly, we disagree that there is an internal inconsistency that renders this provision arbitrary and capricious.

We also conclude that the Departments reasonably explained their approach to case-specific agreements.　The Departments stated in the Rule that their approach "most closely aligns with the statutory intent of ensuring that the QPA reflects market rates under typical contract negotiations."　86 Fed. Reg. at 36,889.　Including in the QPA calculation one-off rates agreed to by insurers and out-of-network providers would preserve the very market distortion that the Act seeks to cure.

We therefore conclude that this provision is neither inconsistent with the Act nor arbitrary and capricious.　Accordingly, we REVERSE the district court's vacatur of this provision.

### 3. Excluding bonus and incentive payments

The next provision of the Rule at issue is its instruction to "exclude" from rates used to calculate the QPA "risk sharing, bonus, or penalty, and other incentive-based and retrospective payments or payment adjustments." 86 Fed. Reg. at 36,894.　The Departments explained that doing so would be

> consistent with how cost sharing is typically calculated for in-network items and services, where the cost-sharing amount is customarily determined at or near the time an item or service is furnished, and is not subject to adjustment based on changes in the amount ultimately paid to the provider or facility as a result of any incentives or reconciliation process.

86 Fed. Reg. at 36,894.

The district court held that this provision of the Rule conflicts with the Act.　It reasoned that the phrase "total maximum payment," as used in the definition of QPA, 42 U.S.C. § 300gg-111(a)(3)(E)(i), "requires insurers

to calculate QPAs using the 'entire,' 'highest possible' payment that a provider could receive for an item or service under the contract rate."

Again, we disagree. The Act itself grants the Departments discretion on whether to include such adjustments. For example, it expressly delegates rulemaking authority regarding how to treat "account payments that are made by such plan or issuer, respectively, that are not on a fee-for-service basis." 42 U.S.C. § 300gg-111(a)(2)(B). It further states that the QPA calculation methodology "*may* account for relevant payment adjustments that take into account quality or facility type . . . that are otherwise taken into account for purposes of determining payment amounts with respect to participating facilities." *Id.* (emphasis added).

We therefore conclude that this provision is neither inconsistent with the Act nor arbitrary and capricious. Accordingly, we REVERSE the district court's vacatur of this provision.

## B. The Deadline Provision

Moving on from the QPA-calculation provisions, we turn now to the Rule's deadline provision.

The Act states that the insurers shall send to the provider either an initial payment or notice of denial of payment "not later than 30 calendar days after the bill for such services is transmitted by such provider." 42 U.S.C. § 300gg-112(a)(3)(A). The Rule, however, states that the thirty-day clock starts on the date that the plan or issuer receives "the information necessary to decide a claim for payment for such services, commonly known as a 'clean claim' under many existing state laws." 86 Fed. Reg. at 36,900.

The district court held unlawful this provision of the Rule on the basis that it contradicts the Act's unambiguous terms. The district court also

noted that this provision "turns a firm 30-day deadline essential to an efficient process into an indefinite delay at the mercy of the insurer."

We agree that this provision of the Rule conflicts with the Act. First, it is important to note that the Act does not expressly delegate to the Departments rulemaking authority over the Act's deadlines, unlike it does for setting the methods of calculating the QPA. *See* 42 U.S.C. §§ 300gg-111(a)(2)(B); 300gg-112(a)(3)(A). Instead, the Departments support this provision by pointing to the statute's general delegation of authority to "promulgate such regulations as may be necessary or appropriate to carry out the provisions of this subchapter." 42 U.S.C. § 300gg-92.

That general delegation of authority does not give the Departments license to alter the Act's unambiguous terms. It is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

The Departments argue that the Rule's deadline provision is lawful because its additional requirements align with the industry's understanding of "bill." But imposing additional requirements on the term "bill" is not the only way in which the Rule's deadline provision departs from the plain language of the Act. It also changes the event that starts the thirty-day clock from when the *provider transmits* the bill, 42 U.S.C. § 300gg-112(a)(3)(A), to when the "*plan or issuer receives* the information necessary," 86 Fed. Reg. at

36,900 (emphasis added).[12]   The Departments' argument about industry practice cannot cure such a blatant departure from the Act's plain language.[13]

We therefore conclude that the Rule's deadline provision conflicts with the Act and AFFIRM the district court's vacatur of this provision.

## C. Disclosure Requirements

Plaintiffs briefed the district court's upholding of the Rule's disclosure requirements, with which they disagree.[14]   They argue that this provision is neither reasonable nor reasonably explained.  In their view, the Rule should also require insurers to disclose information such as the number of contracted rates used to calculate the QPA, the number of times each rate was paid, and the types of providers that agreed to each rate.

The Act grants the Departments considerable discretion in this area. It states that the Departments "shall establish . . . the information [an insurer] . . . shall share with" a provider.  42 U.S.C. § 300gg-111(a)(2)(b)(ii).

The Rule requires insurers to provide, among other things: (1) "a statement certifying that . . . each QPA shared with the provider or facility was determined in compliance with" the Rule; (2) upon request, "whether the QPA includes contracted rates that were not set on a fee-for-service

---

[12] That distinction is significant here.  As Plaintiffs point out, the Rule does not require the plan or issuer to inform the provider of the date on which it receives the necessary amount of information (nor does it meaningfully define what constitutes the necessary amount of information).  As a result, providers would have no guaranteed way of knowing when the thirty-day clock started, and by extension, whether the plan or issuer has complied with the deadline.

[13] We express no opinion on the merits of the Departments' industry practice argument as to the meaning of "bill."

[14] While they called themselves cross-appellants, they did not even call any portion of their briefing the cross-appeal, which is a questionable approach.  We will, nonetheless, address it.

basis . . . and whether the QPA . . . was determined using underlying fee schedule rates or a derived amount"; (3) "if a related service code was used to determine the QPA for a new service code . . . which related service code was used"; (4) "if an eligible database was used to determine the QPA . . . which database was used"; and (5) upon request, whether the contracted rates "include risk-sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments." 86 Fed. Reg. at 36,898–99.

The Rule also provides the following explanation for requiring these specific disclosure requirements:

> The Departments recognize that providers, emergency facilities, and air ambulance providers subject to the surprise billing rules need transparency regarding how the QPA was determined. This information is also important in informing the negotiation process. In addition, IDR entities are directed by statute to consider the QPA when selecting an offer submitted by the parties through the IDR process. Therefore, to decide whether to initiate the IDR process and what offer to submit, a provider, emergency facility, or provider of air ambulance services must know not only the value of the QPA, but also certain information on how it was calculated.

86 Fed. Reg. at 36,898. It further explains that "[t]he Departments seek to ensure transparent and meaningful disclosure about the calculation of the QPA while minimizing administrative burdens on plans and issuers." *Id.* The Departments therefore require "that plans and issuers make certain disclosures with each initial payment or notice of denial of payment, and . . . provide additional information upon request." *Id.* Finally, despite invoking the good cause exception to the notice and comment requirements,

the Rule states that the Departments "seek comment on these disclosure requirements and on what additional information a plan or issuer should be required to share with a provider or facility about the QPA." *Id.* at 36,899.

Plaintiffs offer multiple theories for why the Rule's disclosure requirements are arbitrary and capricious. First, they argue that the lack of additional disclosure requirements dooms the complaint process by which providers can notify the Departments that an insurer's QPA may not satisfy the Act's definition of QPA. But the Act places the responsibility for auditing QPA calculations on the Departments rather than the providers. It requires the Departments to establish a process to audit a sample of plans each year and adds that the Departments *may* conduct an audit upon receipt of a "complaint or other information . . . that involves the compliance of the plan or coverage." 42 U.S.C. § 300gg-111(a)(2)(A)(ii)(II). The permissive language regarding the Departments' response to such complaints undercuts Plaintiffs' argument that the disclosure provision is arbitrary and capricious on this basis. We therefore agree with the district court's conclusion that "it is the permissive language of the Act rather than the [] Rule causing Plaintiffs the alleged harm here."

Second, Plaintiffs assert that the lack of additional disclosure requirements hinders the purpose of the Act's IDR process and is therefore unreasonable. The Departments clearly recognized the relevance to the IDR process of "certain information on how [the QPA] was calculated." 86 Fed. Reg. 36,898. They therefore sought "to ensure transparent and meaningful disclosure about the calculation of the QPA" while also balancing the need for disclosures against "the administrative burdens on plans and issuers." *Id.* That Plaintiffs would balance those competing aims differently than the Departments does not mean the Departments acted unreasonably in selecting which information must be disclosed. The Departments acted "within a zone of reasonableness," and it is not the duty of a court to

"substitute its own policy judgment for that of the agency." *Prometheus Radio Project*, 592 U.S. at 423.

Finally, Plaintiffs contend that the Departments' "paltry explanation" of the disclosure requirements makes them arbitrary and capricious. Plaintiffs fault the Departments for failing to consider a disclosure system under which insurers would be required "to disclose everything (or virtually everything) underlying their calculations." But, as discussed above, the Departments reasonably explained that they sought to balance the benefits of disclosure against its administrative burdens. We therefore conclude that the Departments' explanation "conform[s] to minimal standards of rationality." *Luminant Generation Co. v. EPA*, 714 F.3d 841, 850 (5th Cir. 2013) (quotation omitted).

For these reasons, we hold that the Rule's disclosure requirements are not arbitrary and capricious and AFFIRM the district court's decision to uphold them.

* * *

Our holdings on Plaintiffs' various challenges to the Rule are summarized as follows. We conclude that the provisions of the Rule related to QPA calculations are lawful and therefore REVERSE the district court's holdings as to those provisions. We further conclude that the Rule's deadline provision is unlawful and therefore AFFIRM the district court's holding as to that provision. Finally, we conclude that the Rule's disclosure requirements are lawful and therefore AFFIRM the district court's holding as to those provisions.

### D. The Proper Remedy

We now turn to the proper remedy for the unlawful deadline provision. The Departments argue that remand, rather than vacatur, is the proper remedy for any provisions of the Rule that we hold unlawful.

We have previously explained that remand is the proper remedy for unlawful agency action when two conditions are met: (1) there is a "serious possibility that the agency will be able to correct the rule's defects on remand," and (2) "vacating the challenged action would produce disruptive consequences." *Chamber of Com. of U.S. v. SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023) (internal quotation marks and citation omitted); *see also Tex. Med. Ass'n v. HHS*, 110 F.4th 762, 779 (5th Cir. 2024).

The first condition has not been met. The Departments do not explain how they would correct the deadline provision's defects on remand, let alone contend that they even could. Regardless, we fail to see how they would be able to do so. The Rule's deadline provision is defective because it is an impermissible attempt to "rewrite clear statutory terms to suit [the Departments'] own sense of how the statute should operate." *Util. Air Regul. Grp.*, 573 U.S. at 328.

But even if the first condition could be satisfied, the second cannot. Vacating the deadline provision of the Rule will not produce disruptive consequences; rather, it will retain the Act's more workable statutory deadline. *See supra* at 17 n.11 (explaining logistical difficulties with the Rule's deadline).

Finally, the Departments argue that any relief should apply only to Plaintiffs. While party-specific vacatur is definitely appropriate in other situations, we conclude it is not the appropriate thing to do in this case. As Plaintiffs point out, party-specific vacatur would result in one deadline for Plaintiffs and another (unlawful) deadline for all other entities. That would

conflict with Congress's instruction to establish "one" IDR process for all participants.  42 U.S.C. § 300gg-111(c)(2)(A); *see also Tex. Med. Ass'n*, 110 F.4th at 780 (rejecting party-specific vacatur for same reason).

We therefore hold that the district court did not abuse its discretion by vacating the Rule's deadline provision.

## IV.    Conclusion

For the reasons explained, we REVERSE the district court's vacatur of the QPA calculation provisions, AFFIRM the district court's vacatur of the deadline provision, and AFFIRM the district court's holding as to the disclosure provisions.