RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0074p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

LYNWOOD PICKENS, individually and for others similarly situated,

> *Plaintiff-Appellant/Cross-Appellee*,

*v.*

HAMILTON-RYKER IT SOLUTIONS, LLC,

> *Defendant-Appellee/Cross-Appellant*.

Nos. 24-5407/5459

———————————

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:20-cv-00141—William Lynn Campbell, Jr., District Judge.

Argued:  February 5, 2025

Decided and Filed:  April 1, 2025

Before:  SUTTON, Chief Judge; KETHLEDGE and MURPHY, Circuit Judges.

———————————

## COUNSEL

**ARGUED:**  Richard J. (Rex) Burch, BRUCKNER BURCH PLLC, Houston, Texas, for Lynwood Pickens.  Ashlee Cassman Grant, BAKER & HOSTETLER LLP, Houston, Texas, for Hamilton-Ryker IT Solutions.  **ON BRIEF:**  Richard J. (Rex) Burch, BRUCKNER BURCH PLLC, Houston, Texas, David M. Mathews, JOSEPHSON DUNLAP LLP, Houston, Texas, Melody L. Fowler-Green, YEZBAK LAW OFFICES PLLC, Nashville, Tennessee, for Lynwood Pickens.  Ashlee Cassman Grant, Jennifer R. DeVlugt, BAKER & HOSTETLER LLP, Houston, Texas, for Hamilton-Ryker IT Solutions.  Erin M. Mohan, Anne W. King, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Curiae.

SUTTON, C.J., delivered the opinion of the court in which KETHLEDGE, J., concurred, and MURPHY J., concurred in part.  KETHLEDGE, J. (pg. 22), delivered a separate concurring opinion.  MURPHY, J. (pp. 23–34), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

SUTTON, Chief Judge.  The distinction between "salaried" and "hourly" workers under the Fair Labor Standards Act is easy to state.  Salaried employees receive steady, predictable pay regardless of the number of hours they work.  Hourly workers receive pay based on the number of hours they work.  But sometimes the test is easier to state than to apply.  Lynwood Pickens regularly worked more than 50 hours per week at $100 per hour but was guaranteed pay each week for the equivalent of 8 hours, with every subsequent hour paid hourly.  His employer classified him as "salaried."  He sued.  At summary judgment, the district court determined that Pickens was a salaried worker.  We reverse and remand.

I.

Pickens inspects pipes.  From 2018 to 2019, he worked for an employment agency called Hamilton-Ryker IT Solutions, which assigned him to a natural-gas export terminal in Texas.  For any week in which Pickens worked, Hamilton-Ryker paid him a "guaranteed weekly salary" of $800, a figure based on eight hours of pay at Pickens' $100 hourly rate.  R.100-6 at 8.  If Pickens worked more than eight hours in any given week, which he always did, he received additional compensation at $100 per hour.  Over the course of his employment, Pickens worked 28 hours in his slowest week (receiving $2,800), and 83 hours in his busiest (receiving $8,300).  On average, he worked for just under 52 hours per week, making his usual earnings $5,200 per week, what would come to annualized earnings of $270,400.  If Pickens worked more than 40 hours in a week, Hamilton-Ryker did not pay him overtime (time and a half or $150 per hour) because the company classified him as a salaried worker, making him exempt from the Fair Labor Standards Act.

Pickens viewed this arrangement differently, prompting him to sue the company in 2020 on the ground that he was a non-exempt hourly worker.  Fourteen of Pickens' coworkers opted in to the lawsuit, filed as a "collective action" under the Act.  Pickens and his coworkers moved for summary judgment.  So did Hamilton-Ryker.  The district court granted summary judgment to

Hamilton-Ryker, treating Pickens as a salaried employee under the Act.  It dismissed Pickens' coworkers on the ground that the court had not determined that they were "similarly situated" to Pickens.  Pickens, his coworkers, and Hamilton-Ryker appeal.

II.

Before turning to the merits, we must consider whether a Fifth Circuit case arising from the same pay arrangements for other Hamilton-Ryker employees resolves the issues for us.  In a nearly identical lawsuit filed by Pickens' coworkers against Hamilton-Ryker, the Fifth Circuit held that comparable workers deserved overtime pay.  *Gentry v. Hamilton-Ryker IT Sols., LLC*, 102 F.4th 712, 722–23 (5th Cir. 2024).  Pickens claims that issue preclusion prevents Hamilton-Ryker from relitigating the point in this case.

The problem for Pickens is that offensive issue preclusion generally is unavailable "in cases where a plaintiff could easily have joined in the earlier action."  *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979).  Nothing prevented Pickens from joining or consolidating his claims with Terry Gentry, who filed the first lawsuit.  Both cases challenged the same pay practice.  They involved the same employer.  They concerned the same pay period.  And they arose under the same federal law.  Pickens chose to carve out his claims and pursue separate litigation.  He cannot now claim the benefit of the *Gentry* judgment after avoiding its risks.  A claimant who opts out of a class action may not "claim the benefits of the class's victory" through issue preclusion after steering clear of its perils.  *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n*, 814 F.2d 358, 367 (7th Cir. 1987).  Pickens offers no good reason to treat a collective action under the Fair Labor Standards Act differently.

In insisting that he shouldn't have been required to consolidate his claims with Gentry, Pickens submits that no other factors (like inconsistent judgments) suggest that issue preclusion "would be unfair to" Hamilton-Ryker.  *Parklane Hosiery*, 439 U.S. at 331.  That is true.  But it is irrelevant.  *Parklane Hosiery*'s "general rule" prohibits offensive issue preclusion "where a plaintiff could easily have joined in the earlier action *or* where" preclusion would otherwise "be unfair" to the defendant.  *Id.* (emphasis added).  This bar on free ridership remains even if a defendant has every reason to vigorously litigate the first lawsuit and even if the first lawsuit

came with every procedural protection known to man.  *See, e.g.*, *Lloyd v. J.P. Morgan Chase & Co.*, 791 F.3d 265, 271 n.5 (2d Cir. 2015); *Polk v. Montgomery County*, 782 F.2d 1196, 1202 (4th Cir. 1986); *Hauser v. Krupp Steel Producers, Inc.*, 761 F.2d 204, 207 (5th Cir. 1985); *Premier Elec.*, 814 F.2d at 367; *Sarasota Oil Co. v. Greyhound Leasing & Fin. Corp.*, 483 F.2d 450, 452 (10th Cir. 1973).  Pickens does not present any cognizable circumstances that warrant an exception to *Parklane Hosiery*'s general prohibition against offensive issue preclusion.

### III.

The Fair Labor Standards Act, like many regulatory statutes, starts with a general rule and adds a list of exceptions after it.  Here is the general rule:  An employer must pay his employees overtime if they work more than 40 hours in a week.  29 U.S.C. § 207.  Here are some illustrative exceptions:  An employer need not pay overtime to camp counselors, *id.* § 213(a)(3), fishermen, *id.* § 213(a)(5), cowhands, *id.* § 213(a)(6), small-town journalists, *id.* § 213(a)(8), switchboard operators, *id.* § 213(a)(10), part-time babysitters, *id.* § 213(a)(15), professional baseball players, *id.* § 213(a)(19), and so on.  Here is the exception at issue in this case:  An employer need not pay overtime to "any employee employed in a bona fide executive, administrative, or professional capacity," as those "terms are defined and delimited from time to time by regulations of the Secretary [of Labor]."  *Id.* § 213(a)(1).

### A.

An employee works in a bona fide executive, administrative, or professional capacity if (among other things) he is paid on a "salary basis."  29 C.F.R. § 541.200.  Those other things, by the way, include an employee's duties, *id.* § 541.201, and how much he is paid, *id.* § 541.601(a).  But neither one of them bears on this case.

An employer may satisfy the salary-basis test in one of two ways under the regulations.  *See Helix Energy Sols. Grp. v. Hewitt*, 598 U.S. 39, 46–47 (2023).  The first approach appears in § 602 of the regulations and applies to employees paid by the year, month, or week.  It reads in relevant, if lengthy, part:

*Salary basis.*

(a)  *General rule.*  An employee will be considered to be paid on a "salary basis" within the meaning of this part if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed.

> (1)  Subject to the exceptions provided in paragraph (b) of this section, an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked. . . .
>
> (2)  An employee is not paid on a salary basis if deductions from the employee's predetermined compensation are made for absences occasioned by the employer or by the operating requirements of the business.  If the employee is ready, willing and able to work, deductions may not be made for time when work is not available.
>
> . . .

(b)  *Exceptions.*  The prohibition against deductions from pay in the salary basis requirement is subject to the following exceptions:

> (1)  Deductions from pay may be made when an exempt employee is absent from work for one or more full days for personal reasons, other than sickness or disability.  Thus, if an employee is absent for two full days to handle personal affairs, the employee's salaried status will not be affected if deductions are made from the salary for two full-day absences. However, if an exempt employee is absent for one and a half days for personal reasons, the employer can deduct only for the one full-day absence.
>
> . . .
>
> (6)  An employer is not required to pay the full salary in the initial or terminal week of employment. . . .  However, employees are not paid on a salary basis within the meaning of these regulations if they are employed occasionally for a few days, and the employer pays them a proportionate part of the weekly salary when so employed.
>
> (7)  An employer is not required to pay the full salary for weeks in which an exempt employee takes unpaid leave under the Family and Medical Leave Act.  Rather, when an exempt employee takes unpaid leave under the Family and Medical Leave Act, an employer may pay a proportionate part of the full salary for time actually worked.  For example, if an employee who normally works 40 hours per week uses four hours of

> unpaid leave under the Family and Medical Leave Act, the employer could deduct 10 percent of the employee's normal salary that week.

29 C.F.R. § 541.602.

Under this approach, an employee receives a "salary" if he is paid "a predetermined amount" "on a weekly[] or less frequent basis." *Id.* § 541.602(a). An employee must receive that amount—his "full salary"—"for any week in which [he] performs any work." *Id.* § 541.602(a)(1). His pay may not be docked "for time when work is not available," *id.* § 541.602(a)(2), if he happens to call in sick for a day or two, *id.* § 541.602(b)(1), or if he takes a few hours off "for personal reasons," *id.*

The second approach appears in § 604(b) of the regulations. It applies to employees who are paid by the day, shift, or hour. It reads:

> *Minimum guarantee plus extras.*
>
> (b) An exempt employee's earnings may be computed on an hourly, a daily or a shift basis . . . if the employment arrangement also includes a guarantee of at least [$455] paid on a salary basis, and a reasonable relationship exists between the guaranteed amount and the amount actually earned. The reasonable relationship test will be met if the weekly guarantee is roughly equivalent to the employee's usual earnings at the assigned hourly, daily or shift rate for the employee's normal scheduled workweek.

*Id.* § 541.604(b). Under this approach, an employee whose earnings are "computed on an hourly, a daily, or a shift basis" nonetheless receives a "salary" if he is guaranteed a certain amount per week that is "roughly equivalent" to his "usual earnings." *Id.*

B.

At stake is what it means to be paid on a "weekly basis" under the first approach: § 602(a). Is it enough for an employee to receive any sum (from $0.01 on up) at the start of each week, supplemented by an hourly or daily rate? Or must he receive some fixed compensation that covers a week's worth of work?

To be paid on a weekly basis, we conclude, an employee must be paid for a regular week's worth of work. In this context, the word "basis" refers to the "foundation" of a particular

payment. WEBSTER'S DICTIONARY 225, 227 (2d ed. 1934) (defining "basis" and "base" as the "foundation" of a thing, "thus, a price used as a unit from which to calculate other prices"). Hence the fact that the payment is weekly must not be merely incidental to the payment; the week must serve as the fundamental unit around which the payment is structured. *See Helix*, 598 U.S. at 54. A weekly salary must compensate an employee "for the general value of services performed" over the week, as opposed to merely serving as a minor auxiliary to an employee's substantial hourly or daily pay. 2004 Final Rule, 69 Fed. Reg. 22,122, 22,177 (Apr. 23, 2004). That is what it means to be paid on a weekly basis.

An example captures the point. If someone said that he pays a predetermined amount for rent "on a weekly basis," he would be understood to mean that the amount he pays is calculated based on occupancy for a full week. No one would say that he pays a predetermined amount for rent "on a weekly basis" and by that mean that he pays a fixed sum each Monday for one day's use, but needs to pay extra if he wants to occupy the property from Tuesday through Sunday. So also for a salary. When the regulation says that a predetermined amount must be paid on a weekly basis in the context of a "salary," that amount must be predetermined with reference to the task at hand: paying an employee *a weekly salary*. It is not enough for an employee to be guaranteed *some* fixed amount weekly, which merely makes up a small subset of his pay. He must be paid a "weekly *rate*, rather than a daily or hourly one." *Helix*, 598 U.S. at 54 (emphasis added).

That is what it means to be paid a "salary," whether on a "weekly basis" or not. In 1938, when the Secretary promulgated the predecessor to § 602(a), a "salary" referred to a "[f]ixed payment made periodically to a person as compensation for [his] regular work" over a week, a month, or a year. 9 OXFORD ENGLISH DICTIONARY 48 (1st ed. 1933) (def. 1); *see also, e.g.*, 4 FUNK & WAGNALLS NEW STANDARD DICTIONARY 2162 (1st ed. 1913) (defining a salary as a "periodical allowance made as compensation to a person . . . for his regular work"). That same meaning prevails today. What makes a salary a salary is that it gives an employee a guarantee of his compensation for all of his regular labor over a given period and thus allows him to "decide for himself the number of hours to devote to a particular task." *Brock v. Claridge Hotel & Casino*, 846 F.2d 180, 184 (3d Cir. 1988). A salary, as Judge Silberman once explained,

separates "employees who are given discretion in managing their time and their activities and who are not answerable merely for the number of hours worked or number of tasks accomplished" from those employees whose pay turns on those metrics. *Kinney v. District of Columbia*, 994 F.2d 6, 11 (D.C. Cir. 1993). If ordinary language bears ordinary meaning, a salary that does not compensate an employee for his "regular work" is not a salary. 9 OXFORD ENGLISH DICTIONARY, *supra*, at 48.

The rest of § 602 reinforces this conclusion. Return to the detailed examples given in § 602, all excerpted above. Every single one makes sense only if the "salary" at issue truly covers a week's work. How else, for instance, could one make sense of its insistence that employers pay a "full salary" even "for time when work is not available"? 29 C.F.R. § 541.602(a). Or its explanation that a deduction may be made when an employee "is absent from work for one or more full days for personal reasons" but not otherwise? *Id.* § 541.602(b)(1). Or its description of an employee on unpaid leave, in which case an employer "may pay a proportionate part of the full salary" based on "time actually worked"—requiring a 40-hour-per-week employee who "uses four hours of unpaid leave" to forfeit "10 percent of [his] normal salary"? *Id.* § 541.602(b)(7). Or its caveat that "employees are not paid on a salary basis under these regulations if they are employed occasionally for a few days, and the employer pays them a proportionate part of the weekly salary when so employed"? *Id.* § 541.602(b)(6). Each explanation makes sense when the "salary" at issue covers an employee's standard workweek. And each explanation makes no sense when the "salary" at issue covers only an hour or two (or a minute or two) of an employee's time each week.

That's not the only context-reinforcing clue. Consider what would become of § 604(b)— the second salary test—if any weekly payment, no matter whether premised on a minute, an hour, or a day, could be a salary. Section 604(b), recall, allows an employer to avoid paying overtime to employees paid "on an hourly, a daily, or a shift basis," but only under certain conditions. *Id.* § 541.604(b). The employer must not only pay a guaranteed amount to each employee each week, but that amount also must be "roughly equivalent" to the employee's usual earnings. *Id.* If *any* sum paid weekly qualifies as a salary under § 602(a), § 604(b) "would be left with no work to perform, its terms dead letters all." *Ysleta Del Sur Pueblo v. Texas*, 596

U.S. 685, 698 (2022).  Its reasonable-relationship test would rarely, if ever, apply.  For in the prototypical case in which an employer guaranteed a weekly amount (supplemented by an hourly rate), there would be no need to meet the additional criteria of § 604(b).  The guaranteed amount after all would satisfy § 602(a) by itself.  "[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same [regulatory] scheme."  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013); *see also Pulsifer v. United States*, 601 U.S. 124, 143 (2024).  To give § 604(b) room to operate in a meaningful way, § 602(a) must apply only to those paid a true weekly salary.

What text and context suggest, *Helix Energy Solutions Group v. Hewitt* confirms.  598 U.S. 39 (2023).  There, the company guaranteed the employee a minimum amount ($963) for any week in which he performed work, which happened to be his daily rate.  *See id.* at 47.  If he worked for two days, not just one, he received double that amount ($1,926); if three days, he received triple that amount ($2,889); and so on.  *See id.*  Did that employee "'receive his full salary for any week' in which he work[ed]," the Court asked?  *Id.* (quotation omitted).  No, it answered, because a person is paid a salary under § 602(a) only if "he gets a 'predetermined amount' that cannot be changed 'because of the number of days or hours' he labors"—that is, if he receives "what ordinary people think of as a salary."  *Id.* at 54 n.5.  What the employee in *Helix* received was "a high day rate," but not "a salary (of $963 or any other amount) because his [bi]weekly take-home pay could be as little as $963 or as much as $13,482, depending on how many days he worked."  *Id.*  It made no difference to the Court's conclusion that the employee in *Helix* (who supervised a dozen workers on an oil rig) earned over $200,000 per year.  *Id.*  The salary-basis requirement applied all the same.

How does all of this apply here?  This case could be captioned *Helix II*.  Pickens, just like the employee in *Helix*, was guaranteed payment for a single day's work.  But he was not paid a salary.  Unlike a weekly rate, which compensates an employee for a week's work, no matter the number of hours worked, the rate Pickens received compensated him for either an hour's work or eight hours' work.  *See Gentry*, 102 F.4th at 725; *see also* 2004 Final Rule, 69 Fed. Reg. at 22,177 (distinguishing salaried employees, paid "for the general value of services performed," from employees "paid by the hour or task").  Pickens' eight-hourly "salary" did not come close

to compensating him for his regular 52-hour workweek. Because the company did not pay Pickens a "full salary for any week in which" he "perform[ed] any work," and instead paid him "with[] regard to the number of . . . hours worked," it did not pay him on a salary basis under § 602(a). 29 C.F.R. § 541.602(a)(1). His supposed "salary" of $800—for one day's work— simply did not count as a salary under this provision. It is no more appropriate for Hamilton-Ryker to sidestep *Helix* based on its use of eight hours as the weekly salary than it would be to use 480 minutes as the basis for its weekly salary.

## C.

Hamilton-Ryker objects to this conclusion on several fronts. It starts with text, with what it perceives as the ordinary meaning of "weekly basis." True enough, as Hamilton-Ryker suggests, someone might well use "on a weekly basis" to mean simply "once per week." But that is not always true. In some contexts, "on a weekly basis" can mean not only that an activity occurs once per week, but also that the week serves as the fundamental unit around which the activity is structured. (Hence the "predetermined amount for rent" example above.) To figure out which meaning governs depends on context. "In common language," as Chief Justice Marshall reminds us, "the same word has various meanings, and the peculiar sense in which it is used in any sentence is to be determined by the context." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 19 (1831). Here, for the reasons just given, the relevant terms and the company they keep suggest that a "predetermined amount" paid "on a weekly basis" in the context of a "salary" is a week's pay.

Hamilton-Ryker maintains that the word "salary" is irrelevant, and that we must look at the words of the definition alone. But it is a "fallacy," as Justice Scalia once explained, "to assume that once defined," the defined word "loses any significance, and it is only the definition that matters." *Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 718 (1995) (dissenting op.) (emphasis omitted). "In settling on a fair reading of a statute" or regulation, "it is not unusual to consider the ordinary meaning of a defined term, particularly when there is dissonance between that ordinary meaning and the reach of the definition." *Sackett v. EPA*, 598 U.S. 651, 672 (2023) (quoting *Bond v. United States*, 572 U.S. 844, 861 (2014)). The definition advanced by Hamilton-Ryker—of a "weekly salary" as any weekly payment, big

or small—creates precisely this dissonance. Any uncertainty about the point is relieved by *Helix*. It emphasized over, 598 U.S. at 51–52, and over, *id.* at 54, and over again, *id.* at 55 n.5, that the conventional meaning of "salary" could not be eclipsed by reference to isolated snippets of words shorn of the context in which they appear and the term that the definition purports to define.

It is true that a salary under the regulations may be "all *or part* of [an] employee's compensation," 20 C.F.R. § 541.602(a) (emphasis added), and that an employer thus may pay a salaried employee "additional compensation without losing the exemption," *id.* § 541.604(a). But this contention takes us back to the threshold question whether Pickens is paid a salary at all. *See Helix*, 598 U.S. at 54 n.5. The examples in § 604—the second approach to the salary test—confirm as much. It says that an employer may provide a salaried employee with a "commission on sales," "a percentage of . . . profits," or hourly pay for "hours worked . . . *beyond the normal workweek*." *Id.* § 541.604(a) (emphasis added). This example, and the others too, conform with the principle that an employee is not salaried if he is paid based on a fixed hourly rate for hours worked *within the normal workweek*. Pickens' hourly rate (paid on average for 52 hours a week) cannot fairly be described as merely "additional compensation" to his eight-hourly "salary." Hamilton-Ryker might have *paid* him weekly, but that did not make the arrangement a weekly *salary*. *Cf. Helix*, 598 U.S. at 53.

Hamilton-Ryker claims that *Helix* offers less than meets the eye. The employer in *Helix*, it is true, described its compensation scheme as one based on a daily rate, *id.* at 47–48, rather than a "weekly guarantee" based on an employee's first day at work with additional payments for every day worked thereafter. But Hamilton-Ryker provides no good reason why that distinction should make a difference. The Court in *Helix* told employers that they could "come into compliance with the salary-basis requirement . . . in either of two ways": "[A]dd to" an employee's "per-day rate a weekly guarantee that satisfies § 604(b)'s conditions" or "convert [an employee's] compensation to a straight weekly salary for time he spends on the" job. *Id.* at 60. The Court left no room for a secret third option, in which an employer could evade the Act merely by calling the per-day rate an employee receives for his first day at work each week his "weekly salary." No surprises there. As Justice Frankfurter once wrote, the Court's "decisions

have made one thing clear about the Fair Labor Standards Act: its applicability is not fixed by labels that parties may attach to their relationship." *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 528 (1950) (dissenting op.). What matters is "economic reality," not form. *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961); *see also, e.g.*, *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 804–05 (6th Cir. 2015). The economic reality of Hamilton-Ryker's compensation scheme is precisely the same as the scheme at issue in *Helix*, a system in which each employee's pay packet turns solely on the number of days he works each week. The same approach sensibly applies today.

Hamilton-Ryker maintains that this interpretation focuses too much on purpose and too little on text. But "words are given meaning by their context, and context includes the purpose of the text. The difference between textualist interpretation and so-called purposive interpretation is not that the former never considers purpose. It almost always does," but "the purpose must be derived from the text." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 56 (2012). As in *Helix*, our interpretation does just that. It allows us to identify true executives, administrators, and professionals on the ground that a true salary shows that an employee has "discretion" to "manag[e] [his] time and [his] activities." *Kinney*, 994 F.2d at 11. Hamilton-Ryker's interpretation does nothing of the sort. What point would there be in a regulatory scheme that handled this case and *Helix* differently? The only difference between the two is the label applied to each employee's first day of pay. To allow such easy evasion would make little sense, and much mischief. It would even open up the regulation—and its definition of salary—to the (fair) challenge that it falls outside the "zone of reasonableness" within which an agency must act. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

*Wilson v. Schlumberger Technology Corp.* is not to the contrary. 80 F.4th 1170 (10th Cir. 2023). That employer provided equipment, expertise, and technical support to oil and gas companies seeking to drill new wells. *See id.* at 1173. At issue was the status of one of its engineers, who received a fixed biweekly payment of $924 and additional hourly pay for time spent with a customer (if on standby, $102.50 per hour, and if on a rig, $205 per hour). *See id.* The engineer was not invariably at customers' wells. Even in his busiest year on the job, he averaged less than four hours a week on a rig and fifteen minutes a week on standby. *See id.*

The Tenth Circuit concluded that the engineer received a salary under § 602(a) because his "*base pay*" ($924 biweekly) was not "computed on an hourly, daily, or shift basis." *Id.* at 1176. We have no need to embrace or reject *Wilson* today. It suffices to say that this case differs from that one in an important respect, one flagged by *Wilson* itself. Here, in "stark contrast" to *Wilson*, where the plaintiff received a base payment unrelated to the number of hours worked, supplemented by particular performance-based incentives (much like a commission), all of Pickens' pay was computed on the same "hourly basis." *Id.* at 1179 n.4. The two cases differ in material ways, as the Fifth Circuit recognized in *Gentry*. 102 F.4th at 724–25.

Hamilton-Ryker claims that it would be impracticable to require its compensation scheme to meet the demands of § 604(b). Why? Because, Hamilton-Ryker says, no one can explain how it "could have ensured Pickens' . . . weekly salar[y]" would be "roughly equivalent to [his] usual earnings when [his] hours fluctuated" as much as they did. Second Br. 29 (quotation omitted). The first problem with this argument is that "even the most formidable policy arguments cannot overcome a clear textual directive." *Helix*, 598 U.S. at 59 (quotation omitted). The second problem is that the argument is not that formidable. The regulations are *designed* to ensure that employees are guaranteed either (1) "a true salary," like the compensation received by true executives, administrators, and professionals, or (2) "overtime." *Id.* at 60. Hamilton-Ryker's preferred approach—"*neither* to pay employees a true salary *nor* to pay them overtime"—is one that the salary-basis requirement takes "off the table." *Id.* Complying with the Act "may well increase costs," *id.*, but that is a concern "properly addressed to Congress, not this Court," *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 368 (2018). Because the company did not pay Pickens a salary, it may not claim the Act's exemption.

In a variation on this theme, Judge Murphy worries that our approach will be unworkable for a different reason—that courts will not know how to "decide what qualifies as an employee's 'regular' workweek" for which the employee must be compensated. Dissent at 31. But courts already do just that as a result of § 604(b), which requires employers to guarantee an amount "roughly equivalent" to how much an employee earns in his "normal scheduled workweek." 29 C.F.R. § 541.604(b). As *Helix* tells us, courts may not forgo that requirement merely on the ground that the employee has an irregular work schedule. 598 U.S. at 60. If Hamilton-Ryker

does not wish to "convert [Pickens'] compensation to a straight weekly salary for time he spends on" site, it is free to keep the payment scheme as it is. *Id.* But it may not do so by depriving him of overtime.

Judge Murphy separately claims our interpretation generates a conflict among the examples listed in § 604(a), each of which specifies a kind of "additional compensation" an employer may pay a salaried employee. But we do not see any conflict. A salary, as explained, must cover an employee's regular work. Section 604(a)'s examples of additional compensation fit that mold. They reflect either performance-based incentives that supplement a standard salary (a "commission" and "a percentage of . . . profits") or overtime (hourly pay for "hours worked . . . beyond the normal workweek"). 29 C.F.R. § 541.604(b).

We appreciate Judge Murphy's concerns and agree that this would be a harder case without *Helix*. But in the aftermath of *Helix*, its reasoning, and its emphasis on customary understandings of "salary," we think the employee has the better side of the arguments. In particular, the Court emphasized how the payment plan at issue, like the one here, had little in common with the traditional understanding of a salary. It said: "In demanding that an employee receive a fixed amount for a week no matter how many days he has worked, § 602(a) embodies the standard meaning of the word 'salary.'" 598 U.S. at 51. And it said: "[T]he concept of [a] 'salary' is linked, as a matter of common parlance, to the stability and security of a regular weekly, monthly, or annual pay structure." *Id.* at 52 (quotation omitted). And it said once more: "A worker paid by the day or hour—docked for time he takes off and uncompensated for time he is not needed—is usually understood as a daily or hourly wage earner, not a salaried employee." *Id.* In this context, the language of the regulation and the Court's reasoning favor, if not compel, our interpretation.

IV.

Hamilton-Ryker switches gears, turning to the validity of the regulations themselves. Even if the salary-basis test created by the regulations supports Pickens, the company claims that the regulations exceed the scope of the Secretary's permissible authority under the Act.

A few words are in order at the outset about our approach to this claim and about implied and express delegations of power from Congress to federal agencies. The ancien régime of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.* treated "ambiguous" statutes as "implicit" delegations of authority to agencies, which had final authority to "fill any gap[s]" in the statute with "reasonable" interpretations. 467 U.S. 837, 843–44 (1984) (quotation omitted). *Loper Bright Enterprises v. Raimondo* rejected that "fiction." 603 U.S. 369, 404 (2024). A statutory ambiguity "is not a delegation to anybody," the Court explained, meaning that judges could not "defer" to an agency's interpretation whenever they faced an unclear statute. *Id.* at 400. They must instead do what judges do: arrive at their own "independent judgment" about what the statute means. *Id.* at 412.

In doing away with deference, however, *Loper Bright* did not do away with discretion. *See, e.g.*, Gary Lawson, *"Then What?": A Framework for Life Without* Chevron, 60 WAKE FOREST L. REV. (forthcoming 2025) (manuscript at 47–48). As the Court explained, it will sometimes be the case that "the best reading of a statute is that it delegates discretionary authority to an agency." 603 U.S. at 395. That is not the product of ambiguity. It is the product of "broad and open-ended" grants of authority under the heading of "terms like 'reasonable,' 'appropriate,' 'feasible,' [and] 'practicable,'" *Kisor v. Wilkie*, 588 U.S. 558, 632 (2019) (Kavanaugh, J., concurring in the judgment), all of which are incapable of precise definition not because they are ambiguous, but because they unambiguously convey discretion. *See, e.g.*, Donald L.R. Goodson, *Discretion Is Not (*Chevron*) Deference*, 62 HARV. J. ON LEGIS. 12, 16–17 (2024); *see also* Brett M. Kavanaugh, Book Review, *Fixing Statutory Interpretation*, 129 HARV. L. REV. 2118, 2152–54 (2016). An "express and clear conferral of authority" to an agency "does not rest on *Chevron*'s fiction" at all. *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 286 (2016) (Thomas, J., concurring). It rests on an express delegation of power to an agency.

What should a court do, then, when asked to review whether an agency has permissibly exercised delegated discretion? *Loper Bright* tells us. A court plays its part by (1) "recognizing constitutional delegations," (2) "fixing the boundaries of the delegated authority," and (3) "ensuring the agency has engaged in reasoned decisionmaking within those boundaries." 603 U.S. at 395 (quotation omitted). A court must ensure that the statute contains an "intelligible

principle" and is not an impermissible delegation of legislative power to an executive branch agency. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001); *see also* 5 U.S.C. § 706(2)(B) (court must set aside agency actions that are "contrary to constitutional . . . power"). It must determine the scope of the agency's discretion under the statute by setting out the task that the agency must perform. *Loper Bright*, 603 U.S. at 395; *see also* 5 U.S.C. § 706(2)(C) (court must set aside agency actions "in excess of statutory jurisdiction [or] authority"). And it must ensure that the agency's action is both "reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423; *see also* 5 U.S.C. § 706(2)(A) (court must set aside agency actions that are "arbitrary [or] capricious"). Through it all, we must decide for ourselves "whether the law means what the agency says." *Loper Bright*, 592 U.S. at 392 (quotation omitted).

In sum, then, not all agency actions are alike. In some cases, a statute gives an agency no room at all to maneuver, leaving us with the responsibility to honor the statute's "single, best meaning," "fixed at the time of enactment," whether the agency has the same view or not. *Id.* at 400 (quotation omitted). But in other cases, a statute delegates authority to an agency to define general terms in the statute. *Id.* at 394–95. Under those circumstances, we "respect the delegation" by "fixing the boundaries of the delegated authority" based on our independent view of the statute and "ensuring that the agency acts within" those boundaries. *Id.* at 395, 413 (quotation omitted).

That brings us to this case. The Act, recall, contains an exemption from the wage-and-hour requirements for those employees "in a bona fide executive, administrative, or professional capacity . . . as such terms are defined and delimited from time to time by regulations of the Secretary." 29 U.S.C. § 213(a)(1). All agree that this language expressly delegates discretionary authority to the Secretary of the Department of Labor. And no one in this case contends that this delegation exceeds Congress's constitutional authority because it lacks an intelligible principle. What separates the parties is the scope of that authority and whether the Secretary exercised it in a reasonable way. *Cf. Loper Bright*, 603 U.S. at 413. If the Secretary has "regulate[d] subject to the limits imposed by [the] term or phrase" at issue, we will uphold the regulations. *Id.* at 395.

Start with scope.  Congress gave the Secretary "broad authority" to regulate.  *Auer v. Robbins*, 519 U.S. 452, 456 (1997).  It gave the Secretary two powers, not one, in this instance.  "Define" means to state precisely what something means.  2 OXFORD ENGLISH DICTIONARY, *supra*, at 89 (def. 6b); WEBSTER'S DICTIONARY, *supra*, at 688 (def. 4).  But "delimit" means something  else—to fix or mark boundaries or limits.  2 OXFORD ENGLISH DICTIONARY, *supra*, at 163; WEBSTER'S DICTIONARY, *supra*, at 692.  Congress thus gave the Secretary the power not only to say what it means to work in a "bona fide executive, administrative, or professional capacity," but also to establish a workable method for applying this exemption in practice.

The regulations at issue do just that.  They first come within the Secretary's power to *define*, as they help to clarify whether a person works in a "bona fide executive, administrative, or professional" capacity.  In 1938, as today, such roles were characterized not solely by the type of work performed, but by a person's relative status within a workplace.  An executive, for instance, managed an organization's affairs, WEBSTER'S DICTIONARY, *supra*, at 892 (def. 2); an administrator ran its day-to-day operations, 1 OXFORD ENGLISH DICTIONARY, *supra*, at 118 (def. 1); and a professional exercised learned judgment, *id.* at 1428 (def. 3).  Each role required a degree of independence and discretion.  But hourly pay was anathema to both concepts then and is anathema to both of them now.  While the relevant regulations are framed in terms of a "salary" status as opposed to "non-hourly" status, that justification remains.  Only the security of a steady salary allows an employee to "decide for himself" how to manage his time and activities.  *Brock*, 84 F.2d at 184; *see also Kinney*, 994 F.2d at 11.  That explains why the Secretary concluded in 1940 that true executives, administrators, and professionals possess "authority" and "prestige" incompatible with hourly pay, Harold Stein, U.S. Dep't of Lab., Report at 19, 25 (Oct. 10, 1940), and why he reiterated that conclusion in 1949, finding that "bona fide executive, administrative, and professional employees are almost universally paid on a salary or fee basis," Harry Weiss, U.S. Dep't of Lab., Report at 24 (June 30, 1949).

The relevant regulations also come within the Secretary's power to *delimit*, as they establish a workable and reasonable method for applying the exemption in practice.  It often is not obvious whether an employee works in an executive, administrative, or professional capacity based on their duties or their job title alone.  Think of the supervisor who occasionally helps on

the line. Or the janitor who sometimes picks which rooms his colleagues should clean but mostly works on his own. Or the pipe inspector whose sole job is to inspect pipes. For better or worse, "lines are to be drawn." *Kirschbaum v. Walling*, 316 U.S. 517, 523 (1942).

It made good sense to draw one of those lines based on an employee's salary—an objective metric, readily understood, easily applied (usually), and perhaps "the best single indicator of the degree of importance involved in a particular employee's job." Weiss Report at 9. That is why the Secretary concluded in 1940 that there was "surprisingly wide agreement" among employers and employees alike that the salary criterion was a "valuable and easily applied index to the 'bona fide' character of the employment for which the exemption is claimed." Stein Report at 19. And that is why the criterion has endured for more than 80 years. "[T]he salary tests . . . have amply proved their effectiveness in preventing the misclassification by employers of obviously nonexempt employees, thus tending to reduce litigation" and "simplif[y] enforcement." Weiss Report at 8 (so concluding in 1949); *see also, e.g.*, 2004 Final Rule at 22,165 (same). For regulations that cover hundreds of millions of workers in all sectors of our Nation's economy, that is no mean feat. Under these circumstances, we cannot say that the Secretary has exceeded "the boundaries of the delegated authority." *Loper Bright*, 603 U.S. at 395 (quotation omitted).

That conclusion should not come as a surprise. While the fortunes of implied interpretive deference under *Chevron* have risen and fallen in the courts, the Secretary's exercise of express delegated authority to define executive, administrative, and professional employees has remained stable in the courts. Since the adoption of salary tests in 1940, every court of appeals to consider the question has upheld their validity. The Fifth Circuit did so just a few months ago. *Mayfield v. U.S. Dep't of Lab.*, 117 F.4th 611, 617–19 (5th Cir. 2024). Others did so from 1944 onward. *See Fanelli v. U.S. Gypsum Co.*, 141 F.2d 216, 218 & n.3 (2d Cir. 1944); *Wirtz v. Miss. Publishers Corp.*, 364 F.2d 603, 608 (5th Cir. 1966) (Burger, J.); *Craig v. Far W. Eng'g Co.*, 265 F.2d 251, 259 (9th Cir. 1959); *Walling v. Yeakley*, 140 F.2d 830, 833 (10th Cir. 1944); *Prakash v. Am. Univ.*, 727 F.2d 1174, 1177–78 (D.C. Cir. 1984).

We considered this issue almost 80 years ago. In *Walling v. Morris*, we deemed "[t]he validity and binding effect" of the Secretary's salary tests "well established," and held that the

Act protected the employees in that case because they were "not employed on a salary basis, one of the essential requirements" set by regulation. 155 F.2d 832, 836 (6th Cir. 1946). True, the Supreme Court vacated the decision on other grounds. *Morris v. McComb*, 332 U.S. 422 (1947). But we return to our earlier conclusion all the same.

Hamilton-Ryker asks us to form a minority of one. It objects that the relevant section of the Act does not mention salaries. But neither does it mention job duties, Hamilton-Ryker's preferred coin of the realm. True, Congress could have expressly stated that the Secretary may use an employee's compensation to determine his status. But it also could have directed the Secretary merely to "list qualifying duties" or "specify required tasks." Congress chose not to specify every aspect of what makes a position "bona fide executive, administrative, or professional" in character. That is precisely why it delegated authority to the Secretary to define and delimit those terms. Congress chose not to unduly limit the Secretary's options in implementing the exemptions, and neither will we.

Hamilton-Ryker responds that *other* provisions in the Act limit exemptions to those who receive a "weekly salary," suggesting Congress would have done the same here had it wanted salaries to factor into the analysis. Second Br. 39–40 (quoting 29 U.S.C. § 213(a)(19)). But these other exemptions long postdate the Act's passage. When Congress first passed the Act, it did not predicate any of the exemptions on an employee's compensation. Fair Labor Standards Act of 1938, Pub. L. 75-718, § 13, 52 Stat. 1060, 1067–68. That changed only when Congress amended the Act. *See, e.g.*, Save America's Pastime Act, Pub. L. No. 115-141, § 201(a)(2), 132 Stat. 348, 1126–27 (2018) (codified at 29 U.S.C. § 213(a)(19)) (exempting baseball players who earn a "weekly salary"). While we often presume that Congress acts "intentionally and purposely" when it "includes particular language in one section of a statute but omits it in another section of the same Act," *Brown v. Gardner*, 513 U.S. 115, 120 (1994) (quotation omitted), that presumption falls apart when the laws at issue were enacted 80 years apart. How the 115th Congress changed the Act in 2018 says little about what the 75th Congress enacted in 1938.

Hamilton-Ryker objects that the Secretary's salary-basis rules exclude some employees "who undisputedly perform exempt executive, administrative, or professional job duties."

Second Br. 42–43. But the Tenth Circuit answered that critique in 1944: "Exclusion usually results when we descend from the general to the particular, and Congress must have realized that specific definition and delimitation which would result in certainty of application would of necessity exclude some employees who might otherwise be regarded as within the general phrases used by Congress." *Yeakley*, 140 F.2d at 832. We cannot put it better ourselves. It might well be the case that the lines drawn by the Secretary are imperfect, especially on the margins. But that is in the nature of drawing lines. We ask only that the Secretary exercise "reasoned" judgment, not perfect judgment. *Loper Bright*, 603 U.S. at 395 (quotation omitted). That happened here.

Hamilton-Ryker contends that, even if we uphold the Secretary's general rule that exempt employees must be paid on a salary basis, we should invalidate § 604(b)'s requirement that a guaranteed hourly payment must bear a reasonable relationship to an employee's actual weekly earnings. Section 604(b), recall, gives *employers* another way to deem their employees exempt. Even if an employee *isn't* paid a true salary under § 602(a), it says, an employee is exempt if his employer guarantees him a certain amount each week (currently at least $455) and a "reasonable relationship" exists between the promised amount and the amount he usually earns. 29 C.F.R. § 541.604(b). What § 604(b) does is *increase* an employer's flexibility, so that it may rely on hourly or daily pay (as Hamilton-Ryker would like to do), but in a way that is "consistent with the salary basis concept." *Helix*, 598 U.S. at 47 (quotation omitted). It ensures "a steady stream of pay, which the employer cannot much vary and the employee may thus rely on week after week." *Id.* Section 604(b), in other words, outlines how even an hourly or daily employee might also be paid on a salary basis. The reasonable-relationship condition is a "reasoned" part of that explanation and thus withstands Hamilton-Ryker's challenge. *Loper Bright*, 603 U.S. at 395 (quotation omitted).

V.

In view of our disposition of Pickens' appeal, we need not reach Hamilton-Ryker's cross-appeal, which focuses on whether the district court was required to reject not only Pickens' claim but also the claims of his former coworkers who opted into this lawsuit. All we decide today is that Pickens is entitled to summary judgment on his individual claim. We leave for the district

court to decide in the first instance whether Pickens' action ought to proceed on a collective basis and, if so, how our decision bears on the claims of his coworkers.

For these reasons, we reverse and remand.

––––––––––––––––––––

**CONCURRENCE**

––––––––––––––––––––

KETHLEDGE, Circuit Judge, concurring. I write briefly to point out that I do not see any "regulatory ambiguity" in § 602(a), Dissent at 23, under the law as it comes to us here. We do not interpret phrases in isolation, and in my view—for the reasons stated in Chief Judge Sutton's opinion—the best interpretation of § 602(a) is the one we adopt today.

---

**CONCURRENCE / DISSENT**

---

MURPHY, Circuit Judge, concurring in part and dissenting in part.  I agree with my colleagues that issue preclusion does not apply in this case.  I also agree with them that Hamilton-Ryker IT Solutions structured Lynwood Pickens's compensation in a strange way solely to exempt Pickens from the overtime requirements of the Fair Labor Standards Act. Unlike my colleagues, though, I believe that an unambiguous regulation gave Hamilton-Ryker every right to do so.  In that respect, Hamilton-Ryker's compensation package resembles a company's lawful transaction designed solely to avoid its taxes.  I thus find what we have said in the tax-law context relevant to this labor-law dispute: Whether the Secretary of Labor exempted Hamilton-Ryker's compensation package through an "oversight makes no difference.  It's what the law allowed." *Summa Holdings, Inc. v. Comm'r*, 848 F.3d 779, 786 (6th Cir. 2017).  And if the Secretary does not like this result, she "should fix the problem" by amending the regulation. *Id.* at 790.  Because the majority sees regulatory ambiguity where I see none, I respectfully dissent.

The Fair Labor Standards Act exempts several types of employees from its overtime rules.  *See* 29 U.S.C. § 213(a).  Its exemptions cover "any employee employed in a bona fide executive, administrative, or professional capacity" as these "terms are defined and delimited from time to time by regulations of the Secretary" of Labor.  *Id.* § 213(a)(1).  To implement this exemption, the Secretary has issued a special regulation for highly compensated employees.  *See* 29 C.F.R. § 541.601.  Over the years, the Secretary has increased the income amounts that this regulation requires (and district courts have vacated some of the changes).  *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 84 Fed. Reg. 51230, 51232–35 (Sept. 27, 2019); *Texas v. U.S. Dep't of Lab.*, __ F. Supp. 3d __, 2024 WL 4806268, at *26 (E.D. Tex. Nov. 15, 2024).  Because the evolving income requirements do not matter here, I will refer to the amounts put in place by amendments from 2019.

To show that an employee fell within the exemption for highly compensated employees after these 2019 amendments, an employer needed to establish three basic things. 29 C.F.R. § 541.601 (2020). *First*, the employee must have had a "total annual compensation" of "at least $107,342[.]" *Id.* § 541.601(a)(1). *Second*, this total compensation must have "include[d] at least $684 per week paid on a salary or fee basis" (as the phrases "salary basis" and "fee basis" are defined in other regulations). *Id.* § 541.601(b)(1). *Third*, the employee must have "customarily and regularly perform[ed] any one or more of the exempt duties or responsibilities of an executive, administrative, or professional employee[.]" *Id.* § 541.601(c). Nearby regulations identify the duties that each of these employees must undertake. *See id.* §§ 541.100, -.200, -.300. The exemption for highly paid employees also clarifies that it covers only "office or non-manual work" and thus excludes laborers "no matter how highly paid they might be." *Id.* § 541.601(d).

Pickens does not challenge that his job with Hamilton-Ryker met most of this exemption's elements. As for the total-compensation element, Pickens made $207,876.39 in 2018 and $109,752.67 in the three months he worked for the company in 2019 (amounts well above the sum required by the 2019 amendments: $107,342 per year). As for the duties element, Pickens does not dispute that his job included functions listed in the executive, administrative, or professional exemption (although the parties do not identify these functions with precision). As for the weekly-pay element, Pickens does not dispute that Hamilton-Ryker guaranteed him $800 for every week that he worked (an amount above the $684 weekly sum that the 2019 amendments required).

So why does Pickens claim that he did not qualify as a highly compensated employee? He alleges that Hamilton-Ryker did not pay its weekly guarantee of $800 "on a salary . . . basis[.]" *Id.* § 541.601(b)(1). The Secretary has defined the phrase "salary basis" in a nearby section: § 541.602 (or what I will call "§ 602"). Section 602's key language explains that an employer pays an employee on a "salary basis" if the employee "receives" a guaranteed "predetermined amount" "on a weekly" "basis" as "part of the employee's compensation":

> An employee will be considered to be paid on a "salary basis" within the meaning of this part if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's

compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed.

*Id.* § 541.602(a).  The next paragraph then adds that the employee "must receive the full salary for any week in which the employee performs any work" but that employees "need not" receive this salary "for any workweek in which they perform no work."  *Id.* § 541.602(a)(1).

In my view, this regulation's unambiguous language compels us to hold that it covers Pickens's (unusual) compensation scheme.  Here are the basics of that scheme: For every week that Pickens performed any work, he received a "guaranteed" $800.  Letter, R.97-19, PageID 1701.  Pickens also received an additional $100 for every hour that he worked after eight hours in a week.  *Id.*  In effect, Hamilton-Ryker paid 20% or so of Pickens's compensation through a weekly sum and the remaining 80% or so through an hourly wage.  If he worked only a few minutes in every week of the year, then, he would receive $41,600 ($800*52).  On top of this weekly sum, he would also receive a wage for every hour worked over eight hours in any one week.

Pickens's $800 payment satisfies every part of § 602(a)'s "salary basis" definition.  Did Pickens receive a "predetermined amount"?  29 C.F.R. § 541.602(a).  Yes, Hamilton-Ryker identified the $800 when it hired him.  Was this $800 paid "on a weekly[] or less frequent basis"?  *Id.*  Yes, Hamilton-Ryker "paid" the $800 "by the week" rather than by the hour or by the day.  *Helix Energy Sols. Grp., Inc. v. Hewitt*, 598 U.S. 39, 54 (2023).  Was this sum "subject to reduction because of variations in the quality or quantity of the work performed" during that week?  29 C.F.R. § 541.602(a).  No, Pickens received this amount if he performed *any* work—whether he worked one minute or ninety hours and whether he spent that time daydreaming about the weekend or solving a workplace crisis.  Does it matter that Pickens received more than this $800 whenever he worked more than eight hours in a week?  No, the regulation says that the $800 salary need only be "part of the employee's compensation," so the employer can pay the employee other amounts.  *Id.*  Does it matter that Hamilton-Ryker refused to pay the $800 for any week in which Pickens performed no work?  No, he qualified for the exemption even if he had to work at least some amount to get the salary.  *Id.* § 541.602(a)(1).

My colleagues dispute only one part of this analysis. They hold that Pickens was not paid the $800 "on a weekly[] or less frequent basis[.]" *Id.* § 541.602(a). Why? They interpret the phrase "on a weekly . . . basis" to mean that the "predetermined amount" referred to in § 602(a) must *exclusively* reimburse the employee "'for the general value of services performed'" over the whole week. Maj. Op. 7 (citation omitted). As I understand their position, an employer pays an employee an amount "on a weekly basis" only if the employer does not pay other amounts to the employee for the same work. And Hamilton-Ryker's compensation package flunks this exclusivity requirement because Pickens received a lot more than the $800 guaranteed weekly amount. He also received the $100 hourly wage for every hour that he worked over eight hours.

I disagree with this interpretation because I cannot find any exclusivity idea in the phrase "on a weekly basis." And nothing in the Supreme Court's *Helix* decision or the broader regulatory regime convinces me that we should depart from that phrase's unambiguous meaning.

*Text*. To start, I see no fair reading of the phrase "on a weekly basis" in which it can include an exclusivity requirement that bars other pay for the same work. I did not find the various dictionary definitions of "basis" all that helpful, but I agree that the most apt one is "foundation." *Webster's New International Dictionary of the English Language* 227 (2d ed. 1934); *see Helix*, 598 U.S. at 52. Next, "weekly" when used as an adjective means "[c]oming, happening, or done, every week" as in "a *weekly* payment, gazette, caller." *Webster's*, *supra*, at 2896. So putting the words together, the "foundation" of the predetermined payment must be a "week" or "every week." And since this entire prepositional phrase ("on a weekly basis") acts as an adverb, I find the adverbial definition of "weekly" even more telling: "Once a week." *Id.* Pickens's $800 fits this definition. He received that amount "on a weekly basis" because Hamilton-Ryker paid this amount once for every week that Pickens worked (no matter how many hours he worked in the week). So a week—not an hour or a day—represents the "foundation" for this payment.

Frankly, though, I find these definitions less meaningful than ordinary usage. As the goal of interpretation, we must identify what the phrase "would mean in the mouth of a normal speaker of English" in the "circumstances in which [the phrase is] used." Oliver Wendell

Holmes, *The Theory of Legal Interpretation*, 12 Harv. L. Rev. 417, 417–18 (1899). And my reading best matches how ordinary people use this phrase. If an employer tells its employees that they must attend a computer training "on a weekly basis," an ordinary person would interpret this phrase to mean that the employees must attend this training (of an unidentified length) once per week. Under my colleagues' view, by contrast, the employer would seemingly have commanded the employees to attend the training every working hour of the week (to the exclusion of other work). Or if a Cleveland newspaper says that a certain television show will "air on a weekly basis," the newspaper means that an episode will play once a week. Patrick Cooley, *Trailer Gives Marvel Fans First Look at 'Inhumans' TV Show*, cleveland.com, June 29, 2017, 2017 WLNR 19986377. The newspaper does not mean that the series will run nonstop throughout the week to the exclusion of all other shows. Or if a Houston newspaper suggests that "objects are discovered almost on a weekly basis that could potentially pass close to the Earth," it means that scientists discover these new objects each week. Sondra Hernandez, *NASA: Asteroid 2024 YR4 Not a Threat to Earth*, Houston Chronicle, March 4, 2025, 2025 WLNR 5162276. It does not mean that they are constantly discovering new objects nonstop throughout the week.

To be sure, my colleagues rightly point out that we must place the phrase in its context. "Context is key to meaning." *United States v. Hill*, 963 F.3d 528, 530 (6th Cir. 2020). And here, that context is not weekly trainings, shows, or extraterrestrial objects, but weekly payments. If anything, though, the once-per-week definition fits that context even better. An employee's pay has both a dollar component and a time component. An employee might make $100 per hour, $4,000 per week, or $208,000 per year. And $100 per hour looks a lot different than $100 per day. Stating the dollar figure *alone* thus tells us little about the employee's pay until we know how regularly the employee earns the identified dollar amount. So when a text links a monetary element to a time element, the time element most naturally refers to how regularly the employee earns the dollar element. And "on a weekly basis" serves this precise function in § 602(a).

In contrast, I do not see how the phrase can contain my colleagues' exclusivity element. Suppose an employer agrees to pay an employee both $1,000 "on a weekly basis" and $50 "on an hourly basis." Under my colleagues' view, the employer has not offered the $1,000 "on a

weekly basis" because it has sweetened the pot with the extra hourly pay.  Nobody would draw that conclusion.  Or take the majority's rent analogy.  If tenants sign a contract indicating that they must pay a predetermined amount in rent "on a weekly basis," I agree the tenants would believe that they must pay no more than the identified sum for each week they reside at the home.  But that exclusivity element does not arise from the phrase "on a weekly basis."  It arises from the fact that the contract *lacks any other terms*.  If a contract instead required vacationers to pay $100 "on a weekly basis" plus $500 for each day they physically occupy a beach home, the vacationers could not avoid the daily rent by arguing that the phrase "on a weekly basis" showed that they did not have to pay any other amounts for the week.  And here, § 602(a)'s definition of "salary basis" makes clear that the weekly payment need not be the employee's *exclusive* compensation.  It says that the predetermined amount can be only "*part* of the employee's compensation" for the employee to be paid on a salary basis.  29 C.F.R. § 541.602(a) (emphasis added).  So the text leaves no doubt that "on a weekly basis" cannot perform the role that the majority gives it.

My colleagues respond that their view better fits the ordinary meaning of "salary" in the abstract.  Yet we must follow the unambiguous regulatory definition of "salary basis" even if its text departs from the "ordinary meaning" of the word salary.  *Van Buren v. United States*, 593 U.S. 374, 387 (2021) (quoting *Tanzin v. Tanvir*, 592 U.S. 43, 47 (2020)); *see Garland v. Cargill*, 602 U.S. 406, 428 n.9 (2024).  To be sure, the ordinary meaning of a defined word can help *clarify* ambiguity in a statutory definition of that word.  *Cf. Bond v. United States*, 572 U.S. 844, 861–62 (2014).  But I see no ambiguity in the statutory definition, including its use of "on a weekly basis."  And courts may not use the ordinary meaning of the defined word to *create* ambiguity in the word's statutory definition.  Besides, I am not sure that the ordinary meaning of "on a weekly basis" departs from the ordinary meaning of "salary."  The word "salary" refers to "fixed compensation regularly paid, as by the year, quarter, month, or week."  *Helix*, 598 U.S. at 51 (quoting *Webster's New International Dictionary* 2203 (2d ed. 1949)).  Hamilton-Ryker's guaranteed $800 sum may well fall within this definition since it qualifies as a fixed amount the company paid Pickens by the week.  *See id.*  If employees receive a fixed amount no matter how much they work, why does it matter that they earn extra money?  Executives can receive bonuses that tower over their salaries, but that fact would not mean they did not get paid a salary.

In short, the salary-basis definition has one unambiguous meaning: an employer must pay the predetermined amount each week that an employee performs work, no matter how much work the employee performs. And Hamilton-Ryker's $800 weekly payment to Pickens meets this test.

*Helix*. The Supreme Court's decision in *Helix* also does not support my colleagues' reading of "on a weekly basis." Start with *Helix*'s facts: Helix Energy Solutions Group paid Michael Hewitt between "$963 to $1,341 *per day*" over his time with the company. 598 U.S. at 47 (emphasis added). So Hewitt was not paid an hourly wage because he would receive this amount whether he worked one minute or sixteen hours in a day. But he was also not paid "on a weekly basis" under any view of that phrase. If he worked one day a week, he would get $963 for the week. *Id.* If, by contrast, he worked seven days, he would get $6,741 for the week ($963*7). *Id.* Now compare that pay structure to Pickens's. Pickens got the $800 if he worked one day, two days, or all seven. He thus was paid the $800 on a weekly basis in a way that Hewitt was not.

Turn to *Helix*'s reasoning: the Court read the phrase "on a weekly basis" to mean that a "week" must be the "unit of time used to calculate" how often the employee earns the predetermined amount that § 602(a) requires. *Id.* at 52. That is how I read the phrase too. And Hamilton-Ryker's compensation package satisfied the rule: the company used a week as the unit for deciding how often Pickens earned the $800. Pickens did not earn the $800 every hour that he performed work. Nor did he earn this amount every day that he performed work. Rather, he earned the $800 every week that he performed work. His pay thus falls within *Helix*'s definition.

Notice how I used the verb *earned* in the prior paragraph even though § 602(a) says that an employee must "receive[]" the predetermined amount each week. 29 C.F.R. § 541.602(a). In *Helix*, the Court read the word "receive" to mean "earn" when rejecting the argument that the company paid Hewitt on a weekly or less frequent basis because it *distributed his paycheck* every two weeks. *See* 598 U.S. at 52–53. The Court reasoned that "a 'basis' of payment typically refers to the unit or method for calculating pay, not the frequency of its distribution." *Id.* at 53. So "an employee paid on an hourly basis is paid by the hour, an employee paid on a daily basis is paid by the day, and an employee paid on a weekly basis is paid by the week—

irrespective of when or how often his employer actually doles out the money." *Id.*   Under this view, too, Hamilton-Ryker paid the $800 "by the week" since Pickens earned that amount every week that he performed any work—without regard to how often the company sent him a paycheck. *Id.*

The Court's response to Justice Kavanaugh's dissent also matters here.   The dissent would have held that Helix paid Hewitt the then-applicable required minimum ($455) on a weekly basis because Hewitt received a guarantee of $963 each day that he worked.  *Id.* at 64–65 (Kavanaugh, J., dissenting).   Because Hewitt earned more in a day than the regulation required him to earn in a week, the dissent reasoned, Hewitt always received the required weekly minimum as a practical matter.  *Id.*   The Court rejected this pragmatic reasoning with a formalist response: Even if Helix paid Hewitt "a high day rate," the company technically did not pay him on a weekly basis because the guaranteed sum changed based on the number of days worked in a week.  *Id.* at 54 n.5.

This formalistic reasoning rebuts a distinct argument that Pickens makes.   As Pickens points out, Hamilton-Ryker *determined* Pickens's $800 guaranteed weekly amount based on the hourly wage of $100 that Pickens received for every hour that he worked after eight hours.   As a practical matter, then, Pickens was no different from an hourly employee who made $100 per hour because he always worked more than eight hours each week.   But if a formalistic reading of § 602(a) binds employers (as *Helix* holds), that formalistic reading should also bind employees. I would not read the provision technically when it harms employers and practically when it helps employees.   And again, the company technically paid the $800 on a weekly basis because Pickens earned that amount by the week once he worked a minute, no matter how many hours he worked in the week.   That is true even if the company's $800 salary was effectively paying Pickens for the first eight hours that he worked each week to match the hourly wage that he earned after that.

More generally, why should the way in which a company chooses the fixed "predetermined amount" matter?  29 C.F.R. § 541.602(a).  Suppose a company paid an employee a $2,400 weekly salary.  And suppose internal records showed that it determined this salary by seeking to pay the employee $60 per hour based on the expectation that the employee would

work 40 hours a week ($60*40).  Just because the company chose the weekly number based on what it wanted to pay the employee by the hour would not make the payment an hourly wage.  As long as the company paid this amount no matter how many hours the employee worked, it paid the employee by the week.  Identical logic applies to the $800 that Hamilton-Ryker guaranteed Pickens each week.

*Structure*.  My colleagues' reading of "on a weekly basis" also conflicts with a nearby section: 29 C.F.R. § 541.604 (or what I will call "§ 604").  Section 604(a) says that "[a]n employer may provide an exempt employee with *additional compensation* without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly-required amount paid on a salary basis."  29 C.F.R. § 541.604(a) (emphasis added).  If my colleagues correctly interpret "on a weekly basis" in the salary-basis definition to prohibit an employer from paying more than the "predetermined amount" referred to in § 602(a), § 604(a) could not authorize "additional compensation" for the same week.  Indeed, § 604(a) also gives the following example: "the exemption is not lost if an exempt employee who is guaranteed at least $684 each week paid on a salary basis also receives additional compensation based on hours worked for work beyond the normal workweek."  29 C.F.R. § 541.604(a).  Section 604(a) thus shows that § 602(a)'s predetermined amount can be paid on a weekly basis even if the company pays other money for work performed during the same week on an hourly basis.  *See Wilson v. Schlumberger Tech. Corp.*, 80 F.4th 1170, 1176–77 (10th Cir. 2023).

To their credit, my colleagues acknowledge this issue.  They thus add an exception to the exclusivity requirement that they find in the phrase "on a weekly basis."  They say that an employer may pay an employee more than the predetermined amount for work each week if that added pay is for *overtime* rather than for a "regular week's worth of work."  Maj. Op. 7, 12.  But I see no linguistically plausible way to read "on a weekly basis" to mean "for all the work performed during a *regular* workweek."  Even apart from § 602(a)'s plain meaning, this exception also strikes me as unworkable.  How should courts decide what qualifies as an employee's "regular" workweek?  Should they use the 40-hour week standard in America?  Or should they use an employee's average number of hours over the past few years?  And what

happens if an employee works irregular hours? Or what about other compensation schemes? Suppose that an employer pays a "bonus" of $20 per hour in addition to the required weekly salary. 29 C.F.R. § 541.604(a). I would not adopt a legal rule that requires these sorts of difficult judgment calls or that prohibits bifurcated compensation arrangements. I would instead give "on a weekly basis" its unambiguous meaning.

My colleagues offer several structural counterpoints of their own. They first suggest that other parts of the section that defines "salary basis" (§ 602) justify their reading. Section 602 makes clear that an employer cannot deduct from an employee's salary for down times when it has no work to perform if the employee is "ready, willing and able to work" during those times. *Id.* § 541.602(a)(2). On the other hand, the section also identifies several "exceptions" in which an employer can reduce an employee's salary, including if the employee missed "one or more full days for personal reasons, other than sickness or disability." *Id.* § 541.602(b)(1). Yet these subsections support my reading just as much as my colleagues'. Here, for example, it is undisputed that Hamilton-Ryker still paid Pickens $800 even if it lacked work for him to perform during parts of the week. And, although the parties have identified no evidence on the issue, Hamilton-Ryker likely could have deducted $160 from its guaranteed $800 (the proportionate share of $800 for a day of work) if Pickens missed a day for personal reasons. I thus fail to see how these provisions allow us to depart from the plain meaning of "on a weekly basis."

My colleagues next prefer their reading of "on a weekly basis" on the ground that it gives § 604(b) independent work to perform. That subsection allows employers to pay employees on an "hourly, a daily, or a shift basis" if employers guarantee the minimum weekly amount and a "reasonable relationship" connects that guaranteed weekly sum with the "amount actually earned":

> An exempt employee's earnings may be computed on an hourly, a daily or a shift basis, without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked, and a reasonable relationship exists between the guaranteed amount and the amount actually earned.

29 C.F.R. § 541.604(b). According to the majority, the ordinary meaning of "on a weekly basis" in § 602(a) would read § 604(b)'s "reasonable relationship" requirement out of the regulation. That is, if an employer could satisfy § 602(a)'s salary-basis definition by both guaranteeing a weekly "predetermined amount" and paying the employee an added hourly wage, the employer would never need to show the "reasonable relationship" between the guaranteed amount and the actual earnings that § 604(b) requires. Rather, the employer could rely simply on § 602(a).

That is a good point. Yet tension exists between these two subsections under any view. And I would reconcile that tension like the Tenth Circuit did in *Wilson*. *See* 80 F.4th at 1176–79. Section 602(a) covers employees who receive a "base salary" plus additional compensation paid in any manner (including on an hourly basis). *See id.* at 1176. Section 604(b), by contrast, covers employees (like Hewitt in *Helix*) who do not receive a base weekly salary and whose "*base* pay" is instead calculated on an hourly, daily, or shift basis. *Id.* And here, Hamilton-Ryker did not pay the $800 "on an hourly, a daily or a shift basis" because it paid that amount without regard to the number of hours, days, or shifts worked in a week. 29 C.F.R. § 541.604(b).

Admittedly, this approach may make it easy for employers to avoid § 604(b)'s reasonable-relationship requirement by making clear that they are paying a "base salary" with "additional" hourly wages rather than a base hourly wage with a guaranteed weekly sum. And this structural point may well have led me to read § 602(a) and § 604(b) as imposing *independent* requirements that an employer must meet to satisfy the salary-basis test when the employer relies on a mixed compensation package that includes both a salary paid on a weekly basis and a wage paid on an hourly one. But the Supreme Court rejected that view in *Helix* by suggesting that an employer could satisfy the salary-basis test by meeting *either* § 602(a) *or* § 604(b). *See* 598 U.S. at 46–47, 49. Alternatively, this structural point may well have led me to agree with the majority if I saw any ambiguity in § 602(a)'s language. But I see none. And when "[p]ut to a choice," I would "prefer" following the "ordinary meaning" of § 602(a) as compared "to an unusual meaning that will avoid surplusage" in § 604(b). Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176 (2012). After all, the "cardinal canon" (that we must give words their unambiguous meaning) must trump all other canons (including the rule against superfluity). *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

My reading of the regulation also has the benefit of avoiding a knotty statutory question in this case. The Fair Labor Standards Act exempts employees who work "in a bona fide executive, administrative, or professional *capacity*[.]" 29 U.S.C. § 213(a)(1) (emphasis added). This text seemingly puts the focus on the duties that employees perform and does not impose any requirements on how employers must pay these employees. Like Justice Kavanaugh, I find it at least "questionable" whether a salary test could survive the claim that the regulations exceed the scope of discretion that the Act grants the Secretary. *Helix*, 598 U.S. at 67 (Kavanaugh, J., dissenting); *see id.* at 63 (Gorsuch, J., dissenting). So the more we interpret the regulations to impose strict salary rules, the more we open them up to serious statutory challenge. *Cf. Texas*, 2024 WL 4806268, at *16–25. My view that we should follow the unambiguous meaning of § 602(a) allows me to avoid having to confront this challenge.

I end with a precedential point. My reading undoubtedly conflicts with the Fifth Circuit's view in a similar case involving the same defendant. *See Gentry v. Hamilton-Ryker IT Sols., LLC*, 102 F.4th 712, 720–22 (5th Cir. 2024). But it adheres to the reasoning of the Tenth Circuit decision in *Wilson*. 80 F.4th at 1175–79. Admittedly, that decision involved a far different compensation package in which an employee received a base salary plus an hourly "rig rate" for time spent on a rig. *Id.* at 1173, 1175. Still, the amount that the employee earned through his salary ($28,812.90) fell well below the amount he earned through his rig rate ($72,150). *See id.* And the court held that the employee received his salary on a weekly basis even though (like Pickens) he did not receive his hourly wage only for work "beyond the 40-hour workweek[.]" *Id.* at 1175–79 & n.4. So the existing circuit decisions on this topic already sit in tension with each other.

Because I would affirm the district court, I respectfully dissent in relevant part.